IN THE SUPREME COURT OF THE STATE OF ARIZONA
En Banc

| | | |
|---|---|---|
| KEVIN McDONALD, | ) | Arizona Supreme Court |
| | ) | No. CV-01-0001-PR |
| Plaintiff-Appellant, | ) | |
| | ) | Court of Appeals |
| v. | ) | Division One |
| | ) | No. 1 CA-HC 00-0001 |
| MELVIN THOMAS, Complex Warden, | ) | |
| | ) | Maricopa County |
| Defendant-Appellee. | ) | Superior Court |
| | ) | No. CV 99-15189 |
|   | ) | |

**O P I N I O N**

ON REVIEW FROM DENIAL OF
PETITION FOR WRIT OF HABEAS CORPUS
RELIEF GRANTED

Opinion of the Court of Appeals, Division One
198 Ariz. 590, 12 P.3d 1194 (App. 2000)
VACATED

Robert Bartels                                                                                 Tempe
        - and -
Paul Bender                                                                                    Tempe
College of Law, Arizona State University
Attorneys for Kevin McDonald

Janet A. Napolitano, Arizona Attorney General                                                  Phoenix
        By:     Thomas I. McClory
Attorneys for Melvin Thomas

FELDMAN, Justice

¶1        This is a habeas corpus proceeding in which the trial judge determined that the prisoner, Kevin Lewis McDonald, was not entitled to relief. The court of appeals affirmed, holding that former Governor Fife Symington had complied with the law in denying commutation of McDonald's sentence. We granted review to determine whether the manner in which Governor Symington's office handled this matter complied with constitutional and statutory requirements. We have jurisdiction under article VI, § 5(1) and (4) of the Arizona Constitution and A.R.S. § 12-2101(L)(1).

**FACTS**

¶2        In 1990, McDonald was sentenced to life in prison without possibility of parole for twenty-five years after being convicted of an aggravated assault that he committed with a golf club. *See* Maricopa County Cause No. CR 89-01195. The life sentence was mandatory under the laws existing at the time because McDonald committed the crime while on probation for drug and property offenses. *See* A.R.S. § 13-604.02 (Supp. 1993) (life sentence mandatory for persons convicted of felony involving use or exhibition of dangerous instrument while on probation for felony offense); *see also State v. McDonald*, Nos. 1 CA-CR 90-1106, 90-1107, 90-1115 (consolidated) (App. filed Sept. 5, 1991) (mem. dec.). The legislature subsequently concluded that some of the mandatory sentences imposed under existing laws were unduly harsh and amended many of the statutes. Section 13-604.02 was amended so that persons like McDonald would serve significantly less time than the mandatory life sentence given McDonald. *See* A.R.S. § 13-604.02 (Supp. 1994) (persons convicted of felony involving use or exhibition of dangerous instrument while on probation for felony offense sentenced to presumptive sentence authorized under chapter).

¶3        This change in sentencing created a proportionality problem. Those convicted of violating certain laws before 1994 were treated much more harshly than those convicted of the same violations after the effective date of the amendments. To remedy this problem, the legislature enacted the

2

Disproportionality Review Act (the Act), which permitted review of such sentences and, insofar as relevant to this case, provided that if, on review of the sentence, the Arizona Board of Executive Clemency (the Board) "unanimously recommend[s] commutation and the governor fails to act on that recommendation within 90 days after receiving the recommendation, the recommendation for commutation automatically becomes effective." *See* 1994 Ariz. Sess. Laws ch. 365, § 1(G). The Act went into effect in July 1994 and was repealed on June 30, 1996.

¶4            McDonald applied to the Board for a disproportionality review hearing in May 1995. After conducting the hearing, the Board voted unanimously to recommend that Governor Symington commute[1] McDonald's sentence from life to 8.5 years, as allowed under the 1994 version of A.R.S. § 13-604.02. The recommendation was "based on the Board's belief that the criteria under Disproportionality Review have been met; namely, that [McDonald's] sentence is clearly excessive and that the offender will conform his conduct to the requirements of the law if released." Letter, Arizona Board of Executive Clemency to Hon. Governor Fife Symington, dated August 15, 1995. Because the Board's recommendation for commutation was unanimous, the recommendation would automatically become effective when the governor failed to act to reject it within ninety days after receiving it.

¶5            The Board received a letter dated November 15, 1995 (the letter), informing it that Governor Symington had reviewed McDonald's application for executive clemency and had decided to deny it. The letter, however, is quite unusual in appearance. Because it is important in the resolution of this case, we reproduce it in full as an appendix to this opinion.

¶6            The reader will note that the letter is on plain paper and bears no indication, by letterhead or any other form of imprint, that it came from Governor Symington's office. The letter has a signature line under which are typed the words "Governor or Representative." Finally, the letter is signed with

---

[1] Though McDonald sought a commutation, the term clemency also encompasses paroles, reprieves, and pardons. *See* A.R.S. Title 31, ch. 3. The Act related only to the governor's power to commute a sentence.

3

an illegible signature. Nothing in the letter indicates the name of the person who actually signed it or, if the person was a "representative" of Governor Symington, who that representative might have been or what official position, if any, he or she might have held.

¶7        McDonald filed a petition for writ of habeas corpus, alleging that the Governor had failed to take proper, timely action to deny the Board's recommendation and that his commutation had therefore taken effect by operation of law. The trial judge conducted a telephonic hearing at which McDonald appeared *pro se* from the state prison. He asked for appointment of counsel, but the judge informed him that because habeas corpus is considered to be a civil proceeding, the judge had no authority to appoint counsel. The judge then informed McDonald that he considered the matter to be akin to a summary judgment proceeding. Thus, without taking testimony, the judge concluded that someone signed the letter on behalf of Governor Symington, that the letter was returned to the Board within the ninety-day period set by statute, and that the Governor had therefore acted "in this loose sense" and done all that was required by statute to deny the Board's recommendation. Reporter's Transcript, October 13, 1999 at 5. The judge then summarily denied McDonald's application for the writ.

¶8        McDonald appealed, but because he appeared *pro se* the court of appeals did not hear oral argument. He first argued that the document constituting denial of commutation did not purport to be the Governor's act, that the Governor had no authority to delegate the power to deny commutation to any other person, and that the purported denial dated November 15 was a nullity. In addition, he contended that even if the letter could be considered an act by the Governor, it was an official act under Arizona law and therefore required attestation and recording by the secretary of state to be valid and authentic. *See* A.R.S. §§ 41-101(B), 41-121(2) and (4). Further, McDonald argued, because the document lacked Governor Symington's signature, was not attested by the secretary of state, was not affixed with the seal of the State of Arizona, and was not recorded in the official records of the state, it was void. Thus, there had been no valid denial of the Board's unanimous recommendation and McDonald must be released. A divided court of appeals affirmed, however, ruling against McDonald

4

on each issue. *McDonald v. Thomas*, 198 Ariz. 590, 12 P.3d 1194 (App. 2000). Dissenting, Judge Gerber concluded that the Governor's denial of the Board's recommendation was an official act and was void for lack of signature and attestation. *Id*. at 599 ¶ 43, 12 P.3d at 1203 ¶ 43 (Gerber, J., dissenting).

**¶9** Deeming these to be substantial issues of first impression and statewide importance, we granted McDonald's petition for review, permitted additional briefing, and heard oral argument. *See* Rule 23(c)(4), Ariz. R. Civ. App. P. McDonald is represented in this court by two faculty members from the Arizona State University College of Law, appearing pro bono.

## DISCUSSION

### A. Constitutionality of the Act

**¶10** The State argues that McDonald must first convince us that the legislature had the authority to "usurp" the Governor's constitutional clemency power by declaring "a clemency granted if the Governor fails to act to prevent [the Board's] recommendation from becoming effective." *See* Response to Petition for Review at 2. Indeed, the Attorney General asks whether the Act is "unconstitutional to the extent that it purported to create a commutation by operation of law . . . ." *Id.* "Although A.R.S. § 12-1841 gives the Attorney General broad power to argue in support of the constitutionality of a statute, it does not mandate him to do so in all cases. He clearly retains discretion not to intervene if he concludes it is appropriate to do so." *State ex rel. Woods v. Block*, 189 Ariz. 269, 272, 942 P.2d 428, 431 (1997). Understandably, the Attorney General is reluctant to initiate a frontal attack on a statute in light of her usual position defending the constitutionality of legislation. But the constitutional issue — even if raised indirectly — needs to be settled or we leave in question the validity of at least some of the sixteen (out of 216) Board-recommended commutations that took effect during the disproportionality review period. *See McDonald*, 198 Ariz. at 594 ¶ 14, 12 P.3d at 1198 ¶ 14, citing David Kader and Keith Olbricht, *The Quality of Mercy: A History of Clemency in Arizona,* The Defender 15, 16 (July 2000).

5

### 1. Clemency power

¶11        The State argues that even if commutation is an official act subject to the § 41-101(B) signature and attestation requirements, article V, § 5 and article III of the Arizona Constitution interact to invalidate the legislature's so-called "automatic" commutation approach to the Act. Article V, § 5 reads as follows:

> The Governor shall have power to grant reprieves, commutation, and pardons, after convictions, for all offenses except treason and cases of impeachment, upon such conditions and *with such restrictions and limitations as may be provided by law*.

(Emphasis added.) Thus, argues the State, the power to commute McDonald's sentence is placed solely in the governor's hands, and limiting the governor's decision to refuse clemency by requiring that he act to defeat a unanimous recommendation effectively transfers the clemency power to the Board, thereby violating article V, § 5.[2] *See* Response to Petition for Review at 7.

¶12        While the Act requires that the governor must act to deny commutation, the decision to approve or reject is still the governor's. On receipt of the Board's recommendation, the governor retains ultimate authority to grant or deny a recommended commutation. The Act's so-called automatic aspect is merely a condition prescribing the manner in which the governor must exercise the commutation

---

[2] It is interesting to note that should the State prevail in its constitutional challenge, the validity of all past commutations under our current commutation provisions will be called into question. The pivotal role played by the Board under the Act's provisions is nothing new and, in fact, mimics that set forth in Arizona's other clemency statutes, past and present. The governor's exercise of the clemency power over all felony offenses is effectively subject to the Board's prior approval. "No reprieve, commutation or pardon may be granted by the governor unless it has first been recommended by the [B]oard." A.R.S. § 31-402 (Supp. 2001). Furthermore, the general clemency statute also provides that "[a]ny recommendation for *commutation* that is made unanimously by the members present and voting that is not acted on by the governor within ninety days after the board submits its recommendation to the governor automatically becomes effective." *Id.* (emphasis added). These general clemency provisions predate the Act. *See* 1993 Ariz. Sess. Laws ch. 255, § 65, effective Jan. 1, 1994. Thus, the Act's automatic commutation provision conferred no unique power on the Board. It is, in fact, nearly identical to the clemency process that was and still is reflected in our statutes.

power. *See State v. Marquez*, 127 Ariz. 98, 103-04, 618 P.2d 592, 597-98 (1980); *cf. Laird v. Sims*, 16 Ariz. 521, 529, 147 P. 738, 741 (1915) (limitation of governor's pardon power to cases recommended by board of pardons does not violate Ariz.Const. art. V, § 5). Under the Act, the final decision is made by the governor and no one else. The Act merely restricts the method by which the governor makes the decision, and article V, § 5 expressly permits the legislature to condition, limit, and restrict the governor's power. *Cf. Laird*, 16 Ariz. at 527, 147 P. at 740. If, as *Laird* held, the legislature has the power to limit the governor's ability to grant commutation to those felons who have been recommended by the Board, it surely has the power to restrict the manner in which the governor exercises that discretion. We see no violation of article V, § 5.

### 2. Separation of powers

¶13 The State argues that the legislature has violated article III of the constitution by restricting the governor's method of rejecting commutation applications that the Board has unanimously approved. Article III reads as follows:

> The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

¶14 The seminal Arizona case on separation of powers is *J.W. Hancock Enterprises, Inc. v. Arizona State Registrar of Contractors*, 142 Ariz. 400, 690 P.2d 119 (App. 1984). In *Hancock*, the court of appeals set forth a four-factor test, later adopted by this court in *Block*, 189 Ariz. at 276, 942 P.2d at 435. Under the *Hancock* test, we consider the nature of the power being exercised, the degree of legislative control in the exercise of that power, the legislative objective, and the practical consequences of the legislative action. *See Hancock*, 142 Ariz. at 405, 690 P.2d at 124.

¶15 The first factor may be disposed of summarily because the clemency power is an executive

function, granted to the governor pursuant to article V, § 5. The second factor, the propriety of legislative regulation, is measured by determining whether the legislature's involvement is cooperative or coercive. Under the Act's provisions, the governor retains complete control over the grant or denial of commutation — the governor will either act to deny or will choose to do nothing, allowing the Board's recommendation to take effect. This process does not coerce the governor or otherwise remove the decision from the governor's sound discretion. The third factor is also met, because the Act merely purports to allow the Board (appointed by the governor) to regulate the governor's exercise of the clemency power, as is specifically permitted in article V, § 5. Thus, the legislative motive is plainly to perform its constitutional duty, not to exercise dominion over the governor's power to grant commutation.

¶16 Finally, the fourth *Hancock* factor looks to the practical effect of the Act. The State argues that it sets a "trap" for the "unwary" governor, intended to "supplant the Governor's exercise of a power that the Arizona Constitution reserves for the Governor." Response to Petition for Review at 10. We reject the unwary governor argument. The record of this case illustrates the business-like manner in which the Board operates. It did not slip its recommendations under Governor Symington's door in the dead of night. It, like other executive agencies, developed proper methods of transmitting, receiving, and docketing official communications. The method by which Governor Symington's office handled the matter in question does not conform to minimal standards of business practice and even less to acceptable levels of governmental procedures. If Governor Symington was unaware and trapped, it was not because of anything in the statute but because his office failed to acknowledge receipt of the Board's official communication, failed to establish a file, failed to procure his signature, and failed to keep any official record of his action, assuming the Governor took any action. Nothing in the Act compelled such a method of doing business.

¶17 Thus, the procedures required by the Act are perfectly consistent with article III. The statutory requirement that the Board first recommend clemency operates to prevent the governor from abusing the clemency power. *See, e.g., Laird*, 16 Ariz. at 524-25, 147 P. at 739-40; *see also* Kader

8

and Olbricht, *supra,* The Defender at 15-16. At the same time, it allows the governor to retain full veto power over the Board's recommendation. As required by article V, the governor — and the governor alone — has the final word with regard to whether clemency is granted, and the article III mandate is preserved. The fact that the Act allows automatic commutation in the face of gubernatorial inaction does not destroy but only restricts, as the constitution permits, the governor's method of granting or denying a given commutation recommendation. The Act is not inconsistent with article III of our constitution.

## B.      The governor's intent and the presumption of regularity

¶18      The State argues that McDonald has never produced "a shred of evidence suggesting that the Governor intended to *grant* him a commutation." Response to Petition for Review at 11. True, but we see no relevancy in this argument. What the Governor may have intended is not the inquiry. The sole questions are whether Governor Symington took action to deny the recommendation within ninety days and whether he did so in the manner required by law.[3]

¶19      The State argues that the letter is entitled to a presumption of regularity because it is an official act. But nothing about the letter indicates that it represents some sort of official action by Governor Symington. It is not even signed by him. The signature on the letter does not appear to be his, and the State *does not* claim that it is the Governor's signature.

¶20      We cannot accord such a document any presumption of regularity or validity. The

---

[3] Under the facts of this case, we believe the State's position is uncharitable at best. McDonald was without access to research facilities, without resources, without counsel, and allowed only a telephonic appearance. If anyone were to produce evidence that Governor Symington had acted, one would be inclined to look to the State to show that the piece of paper in question (signed illegibly by someone whose name, position, title, and status, if any, is unknown) was the Governor's act. The State was not unfamiliar with how to accomplish this, the problem having presented itself at least once before this case reached its present stage. *See Hester v. Savage*, No. CIV 97-780 TUC-FRZ (JWS) (U.S. District Court, District of Arizona, filed August 18, 2000) (granting writ of habeas corpus under similar circumstances).

court of appeals, however, cited *Verdugo v. Industrial Commission*, 108 Ariz. 44, 492 P.2d 705 (1972), in support of applying such a presumption in this case, stating that "no evidence in the record shows that the governor did not [act in a correct and legal manner] in this case." *McDonald*, 198 Ariz. at 595 ¶ 22, 12 P.3d at 1100 ¶ 22. In *Verdugo*, however, while saying that a presumption of regularity was in fact the general rule, we went on to note that the rule does not apply in matters such as this one, in which the first

> question is not whether the [official] acted properly . . . or whether the [official] did its duty in considering the matter, but whether the [official] acted at all. In the case at bar, the evidence as to whether the [official] did consider and act is readily available to the [official], while proof that they did not is practically impossible for the petitioner to show. We feel the presumption should be that the [official] did not act absent something in the file showing that the [official] did, in fact, consider the matter and act accordingly . . . .

108 Ariz. at 48, 492 P.2d at 709. There is no file and no official record, and we do not believe the letter bears sufficient indicia of authenticity to meet this burden.

### 1.    Official acts of the governor

**¶21**        McDonald argues that because article V, § 5 of the constitution vests the power of clemency exclusively in the office of the governor, the governor must personally sign the denial of the Board's recommendation. He also says that such action would be an official act and must therefore comply with A.R.S. § 41-101(B), which reads as follows: "All official acts of the governor, except approval of laws,[4] shall be attested by the secretary of state." The State contends that the governor's signature and attestation are merely technicalities and the absence of either or both does not affect validity.

---

[4] With respect to approval of laws presented to the governor, the record keeping and attestation required from the secretary of state are explicitly set forth in the constitution. *See* Ariz. Const. art. V, § 7.

**¶22** We turn first to determine whether the governor's actions under the clemency power granted by article V, § 5 are official acts within the scope of the attestation and record statutes, A.R.S. §§ 41-101(B) (attestation), 41-102(A)(1) (requiring the governor to keep a "record of his official acts"), and 41-121(2) (requiring the secretary of state to keep a record of the governor's attested official acts). It is worth noting that the early interpretations of the 1913 predecessor to the present statute on attestation gave it a very broad interpretation. For example, the 1928 report of the secretary of state to George W.P. Hunt, Governor of Arizona, contains the following section:

### OFFICIAL ACTS OF THE GOVERNOR

> The records of this Department, kept in accordance with the provisions of Subdivision 2, Paragraph 57, Chapter VII, Title 1, Civil Code, Revised Statutes, 1913, show that the Governor has, upon recommendation of the Board of Pardons and Paroles, granted 7 full and unconditional pardons, 13 restorations to citizenship and 194 paroles. He has issued 36 holiday and other proclamations; has honored 17 requisitions from governors of other states for prisoners held in this State: has issued 30 extraditions for prisoners held in other states and wanted for crimes committed in this State; has issued 469 Notarial Commissions, and made 62 executive appointments.

The continuing interpretation given to A.R.S. §§ 41-101(B) and 41-121(2) by succeeding secretaries of state seems to follow this early, broad view. The attestation logs on record contain entries for gubernatorial acts including appointments, proclamations, extradition warrants, pardons, commutations, and denials of same. In fact, the title of the current secretary of state's attestation record is "ATTESTATION OF THE GOVERNOR'S OFFICIAL ACTS: Executive Orders, Proclamations, Commutations of Sentence, Pardons or Reprieves, Stays or Suspensions of Execution."

**¶23** Notwithstanding this, the State argued, and the court of appeals majority agreed, that use of the clemency power is not an official act that must be signed by the governor and attested by the secretary of state. The court of appeals believed, rather, that many actions of the state's executive branch do "not require that each act of every state officer be signed by the governor and attested by the secretary of state." *McDonald*, 198 Ariz. at 594 ¶ 16, 12 P.3d at 1198 ¶ 16 (citation omitted).

While we agree with this view, we believe that many acts of the chief executive are surely of such importance as to fall within the statute.

¶24 But the precise definition of an "official act" as used in A.R.S. § 41-101(B) is somewhat elusive. In a different context, we have held that an official act is "any act done by [an] officer in his official capacity, under color and by virtue of his office." *Ruiz v. Hull*, 191 Ariz. 441, 449 ¶ 31, 957 P.2d 984, 992 ¶ 31 (1998) (quoting *Kerby v. State ex rel. Frohmiller*, 62 Ariz. 294, 310-11, 157 P.2d 698, 705-06 (1945)). This, of course, is broad enough to cover any action taken by the governor in performing the duties of his office. Acknowledging the *Ruiz* and *Kerby* formulation, the court of appeals nonetheless concluded that the term "official act" as used in A.R.S. § 41-101(B) was a great deal more limited. *See McDonald*, 198 Ariz. at 594 ¶ 16, 12 P.3d at 1198 ¶ 16. It believed that the attestation statute applied only to acts that set the public policy of the state. *Id*. at 594 ¶ 17, 12 P.3d at 1198 ¶ 17. To require the governor to sign and have the secretary of state attest anything but the few matters constituting important policy pronouncements would place an undue burden on the executive. "Requiring the governor to sign while the secretary of state is present" for each grant or denial of commutation would seem an undue imposition on our heads of government and burden governmental functioning. *Id*. at 594 ¶ 18, 12 P.3d at 1198 ¶ 18.

¶25 We do not believe the public policy characterization is helpful. What is or is not public policy is subject to debate. For instance, the appointment of judges or heads of executive agencies does not directly set public policy, but it is certainly within the powers exclusively given the governor by constitution or statute. *See, e.g.,* Ariz. Const. art. VI, § 37, art. XI, §§ 3 and 5. Appointing a superior court judge does not and should not set public policy, but we do not believe a lawyer could claim a seat on the bench with only a letter from some "representative" in the governor's office and without at least a formal appointment signed by the governor. The constitution, in fact, does not contain any provision giving the governor direct power to make public policy. The constitutional authority to set

12

public policy is certainly found more in the power to enact rather than execute laws. Thus, it will always be arguable whether any particular act of the governor is one that "sets public policy."

¶26        Concerns about the burden on the governor disappear when we look at the records of the secretary of state. *See Bolin v. Superior Court*, 85 Ariz. 131, 333 P.2d 295 (1958) (court may take judicial notice of records of secretary of state). Even a cursory inspection indicates that governors do not find it burdensome to sign and have the secretary of state attest a multitude of official and semi-official acts ranging from appointments to state offices to proclamations of "Theater in Schools Month," "Elevator and Escalator Safety Awareness Week," "Film in Arizona Month," and "Jump Rope for Heart Day," to summarize the important events that were proclaimed by Governor Hull and attested and recorded by Secretary of State Bayless in October 2000. *See* A.R.S. § 41-121(2) (requiring secretary of state to keep register of and attest governor's official acts). No doubt many of the items that are signed and attested do not qualify as official acts, but the attestation logs demonstrate quite clearly that Governor Hull has not considered signing and attestation to be unduly burdensome.

¶27        Further, nothing in the statute or this opinion requires the governor to personally appear and swear an oath before the secretary of state to have a document attested. In our view, the attestation requirement is not a method of ascertaining the authenticity of the governor's signature but, rather, of authenticating the document and providing a record from which the public may ascertain what the governor has done. *See, e.g., Ex Parte Guy*, 269 P. 782, 783 (Okla. Crim. App. 1928); *Johnson v. Sampson*, 24 S.W.2d 306, 310 (Ky. 1930). Nothing prevents the governor from assigning a staff member the duty of transmitting documents from the governor's office to the secretary of state's office for the purpose of having the secretary of state attest, record, and file the appropriate document. This, in fact, appears to have been the procedure followed in this state in both the past and the present. Certainly, Governor Hull did not personally appear before Secretary of State Bayless on December 28, 1998, to proclaim "Diaper Drive Month." We thus disagree with the State's view that the signature and

13

attestation requirements are so burdensome that only acts constituting important policy announcements need be signed and attested.

¶28　　　　　As noted, the constitution does give the governor certain exclusive powers, among them the authority to grant or deny clemency. It would be unwise, we think, to prolong this opinion with an effort to define each act of the governor that would require signature and attestation. Suffice it to say that an act required by law to be taken by the governor and that falls within the governor's exclusive power qualifies as an official act for purposes of A.R.S. §§ 41-101(B), 41-102(A)(1), and 41-121(2). Because the constitution confers clemency power exclusively on the governor, and because the Act requires the governor to take action if he wishes to reject the Board's unanimous recommendation, we conclude that the act of rejection or denial is an official act.

### 2.　　　Signature and attestation

¶29　　　　　Having determined that denial of commutation is an official act, we turn to the questions of signature and attestation. The first question is who must sign. Even assuming Governor Symington himself decided to deny McDonald's commutation, we cannot agree with the concept that a letter such as the one sent in this case is sufficient to serve as a valid rejection of the Board's unanimous recommendation. The Act is explicit: the Board's unanimous recommendation goes into effect unless the *governor* acts to reject it. Thus, the statute contemplates that only the governor acts to reject the recommendation; it does not contemplate that someone else may act at his behest. More important, as the State reminds us at some length in its constitutional argument, article V, § 5 of the constitution puts the power of commutation exclusively in the office of the governor. We do not believe the constitution contemplates that anyone but the governor may execute the constitutional power of clemency. When the constitution gives the power to the governor and only to the governor, only the governor may act.

14

**¶30** Finally, and most important, if the State's contention were upheld and we were to recognize the validity of a document such as the letter sent in this case, in the future we could be faced with a multitude of hearings to determine whether the person who signed a particular grant or denial of clemency (and many other acts of the chief executive) had the authority to do so and whether he or she properly carried out the governor's decision. This, in fact, has already occurred in several cases more or less similar to the present. *See, e.g., Hester v. Savage*, in which the United States District Court held an evidentiary hearing to determine whether a letter like the one concerning McDonald was actually sent with Governor Symington's authority and whether, if it had been, it could qualify as his rejection of a unanimous board recommendation. No. CIV 97-780 TUC-FRZ (JWS) (U.S. District Court, District of Arizona, filed August 18, 2000).[5] In *Hester*, the district judge determined that Governor Symington had indeed authorized his "young aide" to send the letter but concluded that such a letter did not constitute a valid rejection of the Board's recommendation because it had not been attested by the secretary of state. *See id.,* Findings of Fact and Conclusions of Law at 6, 8, and 23-24. We do not believe the courts and the citizens of this state should be faced with the necessity of judicial proceedings to determine whether acts entrusted only to the governor were actually done by the governor or with the governor's authority.

**¶31** We do not limit the manner in which the governor's name may be signed to a document constituting an official act. Surely, he or she has the power to authorize a staff member to sign the governor's name or use electronic or other signature devices. A governor need not sit at his or her desk and personally sign every document emanating from the office, but the governor must make the decision on all official acts, and the governor's name must be appended to the document constituting the act. The assurance of authenticity comes not from court hearings to establish that the act was actually performed by the governor but, rather, from the secretary of state's attestation and filing in the records

---

[5] *See also State v. Ryan*, No. 2 CA-CR 01-0002-PR (App. filed June 14, 2001) (mem. dec.) (governor signed but no attestation), *review granted* Feb. 8, 2002; *State v. Reyes*, No. 2 CA-CR 00-0549-PR (App. filed June 26, 2001) (mem. dec.), *review granted* Feb. 8, 2002.

of that office. As Judge Gerber noted, this formality creates a record the public may inspect to determine what has been done and to be informed of the contents of the official record. It "prevent[s] gubernatorial activity from slipping below public scrutiny." *McDonald*, 198 Ariz. at 598 ¶ 42, 12 P.3d at 1202 ¶ 42 (Gerber, J., dissenting); *see also Johnson*, 24 S.W.2d at 310; *Guy*, 269 P. at 783.

¶32        This purpose manifests itself when we trace the evolution of the attestation statute. The attestation statute's earliest Arizona antecedents are found in the Civil Code of 1901. "All official acts of the governor, his approval of the laws excepted, *shall be authenticated* by the great seal of the territory, which shall be kept by the secretary thereof." Civ.Code 1901, § 89 (emphasis added). Section 89 provided for authentication of "official acts," not of the governor's signature. It would be contrary to the very principles of good government to recognize official acts of the executive when there is, as here, no record or central depository from which to determine those official acts.

¶33        Nor do we agree with the court of appeals that because "granting commutation . . . by nonaction, can be validly accomplished without attestation — indeed without a signature of any kind — then denying commutation . . . surely must also be able to be effected without seal and attestation." *McDonald*, 198 Ariz. at 594-95 ¶19, 12 P.3d at 1198-99 ¶ 19. But there is nothing to sign or attest when the governor does not act. When the governor *does act* to grant or deny commutation, there is a need to sign and attest because that is the only way to determine that the governor has taken the necessary action. We cannot interpret the Act to permit the governor to grant or deny by a telephone call or letter with no official record. The governor has failed to act when nothing appears in the official record to show that the governor has indeed acted.

¶34        Finally, the State argues that the Act itself does not require signature or attestation of the governor's action to deny. The attestation statute, A.R.S. § 41-101(B), does not specify which

16

provisions of the law it applies to and requires only that official acts be attested. The only rational reading of that statute is that it applies generally to all official acts specified in the laws of this state.

¶35        We thus conclude that because the governor's official act of denial or rejection of the Board's unanimous recommendation was not signed by Governor Symington and attested by the secretary of state, Governor Symington did not act in the manner required by law and the purported denial did not go into effect. Ordinarily, the problem could be cured by proper signature and attestation at the present time, but the Act required a denial or rejection within ninety days, and that time period has long since passed.

## CONCLUSION

¶36        McDonald's sentence was commuted to eight and one-half years' imprisonment, and he has now served more than eleven years. Therefore, he should be discharged from custody. *See* A.R.S. § 13-4131(A).

¶37        IT IS ORDERED, therefore, that relief is granted. The opinion of the court of appeals is vacated, and the Department of Corrections is ordered to release McDonald forthwith.

_____
STANLEY G. FELDMAN, Justice

17

CONCURRING:

_____

CHARLES E. JONES, Chief Justice


_____

RUTH V. McGREGOR, Vice Chief Justice


_____

THOMAS A. ZLAKET, Justice

**APPENDIX**

Mr. Duane Belcher Sr., Chairman
Arizona Board of Executive Clemency
1645 W Jefferson, Suite 326
Phoenix, AZ 85007

Dear Mr. Belcher:

The following application for executive clemency has been reviewed by
the Governor. Documents submitted to our office for our review are
being returned to you under this cover and the Governor's decision is
as follows:

| Applicant's Name | ADOC# (if any) | Type of Action | Governor's Decision |
|---|---|---|---|
| Kevin McDonald | 80265 | Disportionality | *denied* |

Governor or Representative          Date  11-15-95

19