IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA, EX REL. MARK BRNOVICH, ATTORNEY GENERAL,
*Petitioner*,

*v.*

CITY OF TUCSON, ARIZONA
*Respondent,*

JEFF DEWIT, IN HIS OFFICIAL CAPACITY
AS STATE TREASURER,
*Nominal Respondent.*

No.  CV-16-0301-SA
Filed August 17, 2017
**AMENDED BY ORDER FILED AUGUST 17, 2017**

Special Action
**JURISDICTION ACCEPTED; RELIEF GRANTED IN PART**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Paula S. Bickett, Chief Counsel, Civil Appeals Section, Paul N. Watkins (argued), Brunn (Beau) W. Roysden III, Oramel H. (O.H.) Skinner, Evan G. Daniels, John Heyhoe-Griffiths, Aaron M. Duell, Assistant Attorneys General, Phoenix, Attorneys for State of Arizona

Richard M. Rollman (argued), Richard A. Brown, Bossé Rollman PC, Tucson, Attorneys for City of Tucson

Dennis I. Wilenchik, John D. Wilenchik, Wilenchik & Bartness, P.C., Phoenix, Attorneys for Jeff DeWit

Paul F. Eckstein (argued), Jean-Jacques Cabou, Perkins Coie LLP, Phoenix, Attorneys for Amicus Curiae League of Arizona Cities and Towns and Carol McMillan; Brad Holm, City Attorney, Thomas G. Stack, Assistant

City Attorney, Phoenix, Attorneys for City of Phoenix; and Richard W. Files, City Attorney, Rodney C. Short, Assistant City Attorney, Yuma, Attorneys for City of Yuma

Michael J. Rusing, J. William Brammer, Jr., Rusing, Lopez & Lizardi, PLLC, Tucson; and David H. Thompson, Peter A. Patterson, John D. Ohlendorf, Cooper & Kirk, PLLC, Washington, D.C., Attorneys for Amicus Curiae National Rifle Association of America, Inc.

———————

VICE CHIEF JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BALES and JUSTICES BRUTINEL and TIMMER joined. JUSTICE BOLICK concurred in part and in the result. JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ, concurred in part and in the result.

———————

VICE CHIEF JUSTICE PELANDER, opinion of the Court:

¶1        The primary issue we address here is whether the state may constitutionally prohibit a city's practice, prescribed by local ordinance, of destroying firearms that the city obtains through forfeiture or as unclaimed property. We conclude that a generally applicable state statute on this subject controls over a conflicting municipal ordinance, that the legislature may require the Attorney General to investigate and file a special action in this Court regarding alleged violations of the state law, and that this Court has mandatory jurisdiction to resolve whether the allegedly conflicting ordinance violates state law. Applying those principles here, we accept jurisdiction of the State's special action and hold, in accordance with article 13, section 2 of the Arizona Constitution, that A.R.S. §§ 12-945(B) and 13-3108(F) supersede Tucson Code § 2-142.

## BACKGROUND

¶2        In 2000, the Arizona Legislature passed House Bill 2095, which declared:

> It is the intent of the legislature to clarify existing law relating to the state's preemption of firearms regulation in this state. Firearms regulation is of statewide concern. Therefore, the

legislature intends to limit the ability of any political subdivision of this state to regulate firearms and ammunition. This act applies to any ordinance enacted before or after the effective date of this act.

2000 Ariz. Sess. Laws, ch. 376, § 4 (2d Reg. Sess.). That legislation also amended A.R.S. § 13-3108(A) to provide: "[A] political subdivision of this state shall not enact any ordinance, rule or tax relating to the transportation, possession, carrying, sale, transfer, purchase, acquisition, gift, devise, storage, licensing, registration, discharge or use of firearms or ammunition . . . in this state." *Id.* § 2 (codified as amended at A.R.S. § 13-3108(A)).

¶3 In 2005, the City of Tucson passed Ordinance No. 10146 (the "Ordinance"), which enacted Tucson Code §§ 2-140 to -142. Section 2-142 governs the "[d]isposition of unclaimed and forfeited firearms by the [Tucson] police department." Tucson Code § 2-142. The Tucson Code permits the Tucson Police Department to keep a forfeited firearm for its own purposes or to lend or transfer it to another law enforcement agency or museum; otherwise, the Code states that the police "shall dispose" of unclaimed and forfeited firearms "by destroying" them. *Id.*

¶4 In 2013, the legislature amended two statutes governing the destruction of firearms. Section 13-3108 was revised to add new subsection (F), which provides: "[A]ny agency or political subdivision of this state and any law enforcement agency in this state shall not facilitate the destruction of a firearm . . . ." 2013 Ariz. Sess. Laws, ch. 145, § 6 (1st Reg. Sess.) (codified as amended at A.R.S. § 13-3108(F)). And § 12-945(B), contained in an article that governs the disposal of "unclaimed property in [the] hands of [a] public agency," was amended to state:

> [I]f the property is a firearm, the agency shall sell the firearm to any business that is authorized to receive and dispose of the firearm under federal and state law and that shall sell the firearm to the public according to federal and state law, unless the firearm is otherwise prohibited from being sold under federal and state law.

2013 Ariz. Sess. Laws, ch. 145, § 5 (1st Reg. Sess.) (codified as amended at A.R.S. § 12-945(B)). Also enacted by the legislature in 2013, A.R.S. § 12-943 provides that certain specified property, including firearms, "in the

possession of a . . . city . . . may only be disposed of pursuant to this article." 2013 Ariz. Sess. Laws, ch. 145, § 3 (1st Reg. Sess.).

¶5         Pursuant to the Ordinance, between 2013 and October 2016, the City of Tucson destroyed approximately 4,800 unclaimed or forfeited firearms.  In March 2016, the legislature passed Senate Bill 1487, codified primarily in A.R.S. § 41-194.01.[1]  2016 Ariz. Sess. Laws, ch. 35, § 1 (2d Reg. Sess.).  It establishes a framework under which, "[a]t the request of one or more members of the legislature, the attorney general shall investigate any ordinance, regulation, order or other official action adopted or taken by the governing body of a county, city or town that the member alleges violates state law or the Constitution of Arizona."  A.R.S. § 41-194.01(A).  The statute gives the Attorney General thirty days to investigate and provide a "written report of findings and conclusions."  *Id.* § 41-194.01(B).

¶6         If the Attorney General concludes that the regulation or ordinance at issue affirmatively "[v]iolates any provision of state law, . . . the attorney general shall provide notice to the county, city or town . . . of the violation, [and the local government] has thirty days to resolve the violation."  A.R.S. § 41-194.01(B)(1).  If the Attorney General concludes that the matter has not been resolved in that time frame, he "shall . . . [n]otify the state treasurer who shall withhold [from the offending entity] and redistribute state shared monies" until the "offending ordinance . . . is repealed or the violation is otherwise resolved."  A.R.S. § 41-194.01(B)(1)(a)–(b).

¶7         If the Attorney General concludes that the regulation or ordinance at issue "[m]ay violate a provision of state law, . . . [he] shall file a special action in [the] supreme court to resolve the issue, and the supreme court shall give the action precedence over all other cases."  A.R.S. § 41-194.01(B)(2).  And "[t]he court shall require the county, city or town to post a bond equal to the amount of state shared revenue paid to the county, city or town pursuant to §[§] 42-5029 and 43-206 in the preceding six months."  *Id.*

¶8         In October 2016, Representative Mark Finchem asked the

---

[1]  S.B. 1487 is also codified in A.R.S. §§ 42-5029(L) and 43-206(F), which direct the State Treasurer to implement monetary penalties imposed by A.R.S. § 41-194.01.  2016 Ariz. Sess. Laws, ch. 35, §§ 2–3 (2d Reg. Sess.).

Attorney General's Office to investigate whether the Ordinance violates state law. The Office investigated, and the City provided public records and a written response. The City contended that the Ordinance was a valid exercise of the City's "organic law" as a charter city, *see* Ariz. Const. art. 13, § 2, and that the state's firearms statutes "have no application to the City."

¶9　　In November 2016, the Attorney General issued his report, concluding that the Ordinance "may violate one or more provisions of state law" because it requires the destruction of firearms, conflicting with A.R.S. § 13-3108(F), which prohibits any "political subdivision" from "facilitat[ing] the destruction of a firearm." The Attorney General rejected Tucson's charter city argument.

¶10　　After the Attorney General's Office sent its report to the City, the Tucson City Council met in December and refused to repeal or otherwise change the Ordinance. The City did, however, "suspend the implementation of gun destruction required by [the Ordinance] until the issue is adjudicated." That same day the Attorney General's Office filed this special action pursuant to § 41-194.01(B)(2).

¶11　　Several days later, the City filed a complaint in Pima County Superior Court, seeking an injunction against implementation of § 41-194.01 and a declaration that the statute is unconstitutional. The City responded in this Court to the State's special action petition and also moved to dismiss it, arguing that the State's allegations are covered by § 41-194.01(B)(1), not (B)(2), that the State sought relief not provided for in (B)(2), and that dismissal would "allow full consideration of the issues raised in the [City's] superior court action." Earlier this year, we ordered the parties to brief several discrete issues raised in this special action and held oral argument, without prejudice to the parties continuing to litigate the superior court action.

## DISCUSSION

### I.　Separation of Powers Challenge to S.B. 1487

¶12　　This litigation was prompted by a single state legislator's request for the Attorney General to investigate, as required under S.B. 1487 and codified in A.R.S. § 41-194.01(A), whether the City's Ordinance violates state law. Based on the Attorney General's investigation and conclusion that the Ordinance may violate state statutes, and the City's refusal to repeal

or otherwise change the Ordinance, the State filed this special action pursuant to § 41-194.01(B)(2).

¶13        As it has in its pending superior court action, the City raises a host of constitutional challenges to S.B. 1487, but we address only those portions of the law that are directly implicated here.  The City contends that S.B. 1487 violates the separation of powers doctrine, *see* Ariz. Const. art. 3, § 1, by directing the Attorney General to investigate alleged violations upon a single legislator's request and, if the Attorney General concludes that a local ordinance "may violate" state law, requiring him to file a special action in this Court "to resolve the issue."  § 41-194.01(A), (B)(2).  These statutory procedural mandates, the City asserts, unconstitutionally infringe on both executive and judicial powers.  We reject these arguments.

¶14        In determining whether a statute violates separation of powers, we examine: (1) the essential nature of the power being exercised; (2) the legislature's degree of control in the exercise of that power; (3) the legislature's objective; and (4) the practical consequences of the action.  *State ex rel. Woods v. Block*, 189 Ariz. 269, 276 (1997).  As for the first factor, implementing the law, disbursing appropriations, and enforcing legislative conditions on appropriations are essentially executive functions.  *See id.* at 277 (stating that "acts necessary to carry out the legislative policies and purposes already declared by [the Legislature] are administrative" and, thus, "executive function[s]" (first alteration in original) (internal quotation marks omitted) (quoting *Pioneer Trust Co. v. Pima Cty.*, 168 Ariz. 61, 65 (1991)).  Under S.B. 1487, the executive branch exercises those powers.

¶15        Regarding the second factor, neither the requesting legislator(s) nor the legislature as a whole controls the "exercise" of the executive branch's investigative and enforcement power under S.B. 1487.  In fact, the legislature has no role beyond initiating Attorney General review.  The Attorney General retains his discretion to apply independent legal analysis and judgment when opining whether a municipal action violates state law.  He also retains discretion to choose the legal positions he will advance should he file a special action under § 41-194.01(B)(2).  A legislator does not control the investigation itself, decision-making related to the investigation, or any action taken upon a determination under § 41-194.01.  *Cf. McDonald v. Thomas*, 202 Ariz. 35, 41 ¶ 17 (2002) (upholding legislative enactments that increased the power of clemency board recommendations and imposed time limitations on the Governor's power to act on those recommendations because "the governor—and the governor

alone—has the final word with regard to whether clemency is granted"). *But cf. Woods*, 189 Ariz. at 276–78 (holding that the legislatively created Constitutional Defense Council, the controlling members of which were appointed by the legislature, violated separation of powers because it "create[d] conflict between an executive agency and a legislative agency performing an executive function").

¶16　　　Nor does the third or fourth factor support a finding that S.B. 1487 violates separation-of-powers principles. The enactment itself suggests that the legislature's apparent objective in S.B. 1487 was not to usurp executive or judicial authority but rather to require and incentivize political subdivisions to comply with state law. Likewise, the practical consequence of S.B. 1487 is to encourage compliance with state law, not to coerce, control, or interfere with executive powers or prerogatives.

¶17　　　S.B. 1487 permits a single legislator to initiate and require an investigation by the Attorney General's Office. *See* § 41-194.01(A). But other statutes similarly allow or direct the initiation of an investigation or issuance of an opinion upon legislative request. *See* A.R.S. §§ 32-3246(D), 41-193(A)(7). We do not view S.B. 1487 as materially different for separation-of-powers purposes, and the City cites no authority for finding it unconstitutional.

¶18　　　The Attorney General's duties are "prescribed by law," Ariz. Const. art. 5, § 9, and through S.B. 1487 the legislature has validly established that a single legislator may compel an Attorney General investigation and opinion (and nothing more) regarding whether a local ordinance violates state law. That this procedure may cause the Attorney General's Office to focus and expend resources to identify possibly conflicting local laws and to resolve any related issues in this Court does not offend separation-of-powers principles. The procedure authorized by § 41-194.01(A) is very different from a legislative attempt to direct the exercise of prosecutorial discretion in a criminal case or civil enforcement action.

¶19　　　Upon the Attorney General's determination that a local law "[m]ay violate a provision of state law," S.B. 1487 also requires the Attorney General to file a special action "to resolve the issue" in this Court, which shall prioritize the action "over all other cases." § 41-194.01(B)(2). Those provisions do not unconstitutionally infringe on judicial power. The Attorney General is not exercising a judicial function in determining

7

whether an action may violate state law. Rather, such determinations are legal opinions, which the Attorney General routinely and permissibly issues in other contexts. *See* § 41-193(A)(7) (stating that "[u]pon demand by the legislature, or either house or any member thereof," the Attorney General's Office shall "render a written opinion upon any question of law relating to their offices"); *cf.* A.R.S. § 41-1481(B) (requiring, at any citizen's request, the Attorney General's Civil Rights Division to investigate complaints of employment discrimination); *id.* § 41-1491.09 (providing the same for Fair Housing complaints).

¶20        Moreover, as this case illustrates, judicial review is available when the Attorney General determines that a local ordinance "may violate" state law. And even if the Attorney General were to conclude under § 41-194.01(B)(1) that a local law violates state law, the offending municipality has a cure period and (as the State concedes) may file an action challenging the conclusion and any withholding of funds.[2] *See, e.g.*, Ariz. R.P. Spec. Actions 1(a). In either case, the Court must decide, or at least retains discretion to decide, the issue. Because S.B. 1487 "leaves the judiciary free to make its own determination based on the particular facts of a case," it "comports with separation of powers." *State v. Rios,* 225 Ariz. 292, 299 ¶ 22 (App. 2010); *cf. Cactus Wren Partners v. Ariz. Dep't of Bldg. & Fire Safety*, 177 Ariz. 559, 563 (App. 1993) (concluding that because a statute did not "constitute[] a 'coercive influence' upon the judiciary," it did not unconstitutionally usurp judicial power).

## II. Jurisdiction

¶21        We next address whether this Court's special action jurisdiction under § 41-194.01(B)(2) is mandatory, as the State contends, or discretionary, as the City asserts. Based on the statute's text, its underlying legislative intent, and the legislature's constitutional authority to prescribe this Court's jurisdiction, we conclude that our jurisdiction in this matter is mandatory.

---

[2] Because § 41-194.01(B)(1) is not at issue here and does not directly impact the questions before us, we express no opinion on the constitutionality of that subsection, including its provision permitting the Attorney General to unilaterally decide whether appropriated monies should be withheld by the State Treasurer from the offending political subdivision and redistributed.

¶22         When, as here, the Attorney General determines that a municipal ordinance or regulation "may violate" state law and then files a "special action" in this Court pursuant to § 41-194.01(B)(2)'s mandate, the statute compels us "to resolve the issue" and "give the action precedence over all other cases." As long as it comports with the Arizona Constitution, that language quite clearly makes our jurisdiction mandatory. *See Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 394–95 (3d Cir. 2013) (characterizing as "a mandate" Congress's statement that a particular claim "shall be brought" in a "district court").

¶23         Our state constitution identifies the various components of this Court's subject matter jurisdiction and, in a catch-all provision, vests the Court with "[s]uch other jurisdiction as may be provided by law." Ariz. Const. art. 6, § 5(6); *see also* A.R.S. § 12-102(A) ("The supreme court shall discharge the duties imposed and exercise the jurisdiction conferred by the constitution and by law."). Under that authority, the legislature may expand, but not contract, this Court's original jurisdiction as long as doing so does not otherwise violate the constitution. That is precisely what the legislature did by enacting § 41-194.01(B)(2). No constitutional impediment prevents or nullifies that action.

¶24         Section 41-194.01(B)(2) provides "mandatory" jurisdiction for this Court in the sense that this is a statutory special action rather than a "discretionary" special action. (The latter reflects the Court's constitutional authority to issue extraordinary writs under article 6, section 5(1), which historically were a form of discretionary relief, *see Dobson v. State*, 233 Ariz. 119, 121 ¶ 6 (2013).) "[S]tatutory special actions 'are not at all discretionary.'" *Circle K Convenience Stores, Inc. v. City of Phoenix*, 178 Ariz. 102, 103 (App. 1993) (quoting Ariz. R.P. Spec. Action 1 state bar committee's note to subsec. (b)); *accord Book Cellar, Inc. v. City of Phoenix*, 139 Ariz. 332, 336 (App. 1983). By requiring the Attorney General to file "a special action" in this Court if he determines that a local ordinance "may violate" state law, and by directing the Court "to resolve the issue" and "give the action precedence over all other cases," § 41-194.01(B)(2), the legislature clearly intended for us to have mandatory jurisdiction.

¶25         The City contends that § 41-194.01(B)(2) is inapplicable and thus cannot support jurisdiction here because the State asserts in its special action briefs that Tucson Code § 2-142 "does in fact violate," not merely that it "may violate," state law. "Under § 41-194.01(B)(1)," the City argues, "the Attorney General's finding that a local ordinance 'does' violate state law

triggers a different path—administrative action by the Attorney General and Treasurer—not a special action under (B)(2)." But the City misapprehends the relationship between (B)(1) and (B)(2). The latter recognizes that there might be circumstances, as this case illustrates, when a local ordinance arguably violates state law, but the issue is not settled by existing case law. In light of (B)(2), the most reasonable interpretation of (B)(1) is that it allows a "does violate" determination only when existing law clearly and unambiguously compels that conclusion. Otherwise, it is this Court's responsibility "to resolve the issue" via a process that, as the State notes, is "akin to a standard declaratory judgment action." § 41-194.01(B)(2); *see also* A.R.S. § 12-1831 to -1846; *cf. Ariz. Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 354–55 ¶¶ 33–34 (2012) (stating that this Court is authorized and obligated "to interpret and apply constitutional law," that is, "to say what the law is" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

**¶26** Finally, we reject the City's contention that "§ 41-194.01(B)(2)'s purported mandatory jurisdiction unconstitutionally invades the Court's rule making authority" concerning "procedural" matters. *See* Ariz. Const. art. 6, §§ 1, 5(5). Because article 6, section 5(6) of the Arizona Constitution expressly authorizes the legislature to expand this Court's original jurisdiction, it arguably does not matter whether S.B. 1487's grant of such jurisdiction is "procedural" or "substantive." Even if that distinction were pertinent here, however, the City's contention is without merit.

**¶27** Although "the legislature and this Court both have rulemaking power, . . . in the event of irreconcilable conflict between a procedural statute and a rule, the rule prevails." *Seisinger v. Siebel*, 220 Ariz. 85, 89 ¶ 8 (2009). But because "the legislature has plenary power to deal with any topic unless otherwise restrained by the Constitution," if a "statute conflicting with a court-promulgated rule is 'substantive,' the statute must prevail." *Id.* at 92 ¶ 26 (citations omitted). "[T]he precise dividing line between substance and procedure" is at best elusive. *Id.* at 92 ¶ 29.

**¶28** Even assuming that subsection (B)(2)'s vesting of mandatory jurisdiction in this Court is purely procedural, we find no "irreconcilable conflict" between that provision and our procedural rules. *Id.* at 89 ¶ 8. And pursuant to its plenary constitutional and statutory authority, *see* Ariz. Const. art. 6, § 5(6); A.R.S. § 12-102(A), in other contexts the legislature has vested this Court with mandatory jurisdiction when doing so did not

conflict with court rules. *See, e.g.*, A.R.S. § 16-351(A) (providing that superior court rulings on nominating petitions "shall be appealable only to the supreme court"); *id.* § 13-4031 (providing that criminal actions in which a death sentence is imposed "may only be appealed to the supreme court"); *cf. Fleischman v. Protect Our City*, 214 Ariz. 406, 408–09 ¶ 12 (2007) (identifying areas in which the legislature has vested exclusive jurisdiction in this Court). In addition, as it has in § 41-194.01(B)(2), the legislature has required this Court to give precedence to certain other actions. *See* A.R.S. § 48-3706(C) (requiring this Court to "give[] precedence" to special actions from water conservation district orders).

**¶29**        In short, § 41-194.01(B)(2)'s mandatory jurisdiction and procedural framework do not run afoul of this Court's rule-making authority. And, as the State has acknowledged, the "mandatory" jurisdiction under (B)(2) would not require the Court to decide a case that is moot or otherwise nonjusticiable. Accordingly, we exercise the jurisdiction established by subsection (B)(2) and deny the City's motion to dismiss the special action.

### III.  Bond Requirement

**¶30**        Section 41-194.01(B)(2) provides that "[t]he court shall require the county, city or town to post a bond equal to the amount of state shared revenue [("SSR")] paid to the county, city or town pursuant to §[§] 42-5029 and 43-206 in the preceding six months." In an uncontested declaration filed in this Court, the City states that its SSR for the 2016–2017 fiscal year is approximately $115 million or 23.5% of the City's budget. Similarly, in its pending superior court action, the City alleged that during the six-month period between June and November 2016, "the City received SSR under §§ 42-5029 and 43-206 in the aggregate amount of $55,639,999.37," and that the City could not post a bond at or near that amount as it would "exceed[] the sum total of the City's available reserves by nearly $5 million." The State has not requested — and this Court has not ordered — posting of a bond in this action. Whether the statute requires the Court to order a bond even absent any request is not before us.

**¶31**        The State contends that S.B. 1487 makes the (B)(2) bond mandatory but that this Court has authority to reduce or waive the bond in certain circumstances, for example, when requiring the bond would lead to absurd or impossible results or cause a "severe financial hardship." The City acknowledges (B)(2)'s mandatory wording ("shall"), but argues we

should interpret the bond provision "as directory, and therefore discretionary," because otherwise it poses "an unconstitutional financial blockade to judicial access." *See Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 554–55 (1981) (interpreting "shall" as permissive rather than mandatory to preserve a statute's constitutionality).

¶32 We agree with the State that the bond provision is mandatory, but we share the City's concerns regarding the bond's purpose, basis, practical application, and constitutionality. *See* Ariz. Const. art. 3, § 1 ("Distribution of Powers"); *id.* art. 6, § 1 ("Judicial power; courts"), § 5(5) (vesting the Supreme Court with "[p]ower to make rules relative to all procedural matters in any court"); *cf. Eastin v. Broomfield*, 116 Ariz. 576, 586 (1977) (finding a non-waivable cost bond requirement in medical malpractice cases unconstitutional under article 2, section 13 of Arizona Constitution, "by denying access to the courts"); *New v. Ariz. Bd. of Regents*, 127 Ariz. 68, 70 (App. 1980) (finding a bond requirement in negligence actions against the state unconstitutional as "a monetary blockade to access to the courts").

¶33 The statute does not identify the purpose of a large bond, the practical application or enforcement of the bond requirement, or the disposition of the bond proceeds upon the conclusion of the special action; nor does it provide that posting the bond is, or is not, a precondition for a political subdivision to defend its position or for this Court to address and rule on the merits. But even assuming that failure to comply with the bond requirement would not bar a city from challenging a (B)(2) action, that requirement, if enforced, would likely dissuade if not absolutely deter a city from disputing the Attorney General's opinion of a local law's constitutional validity. Such acquiescence, in turn, would displace this Court from its constitutionally assigned role under article 6 of interpreting Arizona's constitution and laws — effectively preventing final judicial resolution of the issue on which the Attorney General has specifically requested a ruling pursuant to § 41-194.01(B)(2). *Cf. Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 8 (2006) ("To determine whether a branch of state government has exceeded the powers granted by the Arizona Constitution requires that we construe the language of the constitution and declare what the constitution requires."). In effect, the bond requirement problematically instructs us to charge a substantial fee — unrelated to securing a monetary judgment or costs for a non-appealing party — if a political subdivision defends on constitutional grounds a local

ordinance the Attorney General challenges in an original action filed in our Court.

**¶34**      In any event, although the purpose, practical application, and ramifications of the bond requirement are unclear, the State asserts that if it is meant to ensure that a city "does not benefit from receiving SSR while possibly violating state law, then an agreement to cease the violating action (and enforcement thereof) is likely to fulfill that purpose in the same way as a bond."   Because that is the situation here (inasmuch as the City voluntarily agreed to suspend Tucson Code § 2-142 pending this litigation), the State sees no reason to impose the bond requirement against the City. In addition, assuming the bond requirement is unconstitutional, the State asserts that it can be severed because, "[e]ven without the bond provision, the statute would achieve the Legislature's purpose—incentivizing state-law compliance and quickly resolving whether a subdivision is violating state law." *See State Comp. Fund v. Symington*, 174 Ariz. 188, 195-96 (1993) (setting forth requirements for finding severability).

**¶35**      In his concurrence, Justice Gould declares the bond provision "unenforceable because it is incomplete and unintelligible."   *Infra* ¶ 85 (Gould, J., concurring in part and in the result).   Neither party made this argument.  And given the procedural posture of this case, there is no reason to address the enforceability of (B)(2)'s bond provision.  Whether the bond requirement may, as written, be constitutionally enforced, or ignored under the novel theory advanced by Justice Gould, can be addressed in future cases where that issue is specifically raised and we have the benefit of full briefing on that particular point.  Here, we instead turn to the issue raised by the special action petition — whether the Ordinance conflicts with and violates state law.  *Cf. Slayton v. Shumway*, 166 Ariz. 87, 92 (1990) (we generally seek to avoid constitutional issues when interpreting and applying statutes).

### IV.   Validity of Tucson Code § 2-142 under State Law

**¶36**      With certain exceptions, Tucson's Ordinance provides that the City's police department "shall dispose" of unclaimed and forfeited firearms "by destroying" them. Tucson Code § 2-142. State law, in contrast, specifically prohibits any political subdivision or law enforcement agency from "facilitat[ing] the destruction of a firearm," A.R.S. § 13-3108(F), and instead, with certain exceptions, requires public agencies to "sell the firearm to any business that is authorized to receive and dispose of the

firearm under federal and state law," A.R.S. § 12-945(B); *see also id.* § 12-943 (providing that certain specified property, including firearms, "that is in the possession of a ... city ... may only be disposed of pursuant to this article"). Thus, the Tucson Code unquestionably conflicts with Arizona law on this subject.

¶37 Under state law, a political subdivision may not "enact any ordinance ... relating to," among other things, the possession, sale, transfer, purchase, acquisition, or use of firearms in Arizona. A.R.S. § 13-3108(A). In no uncertain terms, the Arizona Legislature has declared that "[f]irearms regulation is of statewide concern" and has expressed its intent to preempt "firearms regulation in this state" and thereby "limit the ability of any political subdivision of this state to regulate firearms." 2000 Ariz. Sess. Laws, ch. 376, § 4 (2d Reg. Sess.). We of course respect the legislature's statements, but "whether state law prevails over conflicting charter provisions under Article 13, Section 2 is a question of constitutional interpretation." *City of Tucson v. State* (*Tucson II*), 229 Ariz. 172, 178 ¶ 34 (2012); *cf. Clayton v. State*, 38 Ariz. 135, 145 (1931) (subject to judicial review, the state legislature, not a city, determines whether a particular subject "is of general statewide concern or of purely municipal concern"). Thus, pursuant to § 41-194.01(B)(2), the Attorney General properly asked this Court to resolve that legal issue.

¶38 Despite the legislature's broad pronouncements regarding firearms, the City argues that Tucson Code § 2-142 does not violate state law because it is authorized and protected by article 13, section 2 of the Arizona Constitution. The clear conflict between its Code and state law, the City asserts, "does not require the repeal of [the Ordinance] because as a charter city it is authorized to determine matters of local concern free from the Legislature's interference." According to the City, "[d]isposition of the City's own property—even firearms—is solely a matter of local concern," and therefore Tucson Code § 2-142 "supersedes A.R.S. §§ 12-945(B) and 13-3108(F)" under article 13, section 2. The State counters that its applicable, firearms-related statutes implicate several matters of statewide, not merely local, concern and therefore govern over the conflicting municipal Ordinance. We agree with the State.

¶39 Our analysis begins with the "home rule charter" provision in Arizona's Constitution, which from statehood has provided that any city with a population of more than 3,500 "may frame a charter for its own government consistent with, and subject to, the Constitution and the laws

of the state." Ariz. Const. art. 13, § 2. Once adopted and approved, a city's charter is, "effectively, a local constitution." *Tucson II*, 229 Ariz. at 174 ¶ 10. By statute, the roots of which also trace back to statehood, *see* Rev. Stat. of Ariz., Civ. Code, tit. 7, ch. 16, ¶¶ 2033, 2036 (1913), the charter "shall prevail" over any conflicting law relating to charter cities in force when the charter was adopted and approved. A.R.S. § 9-284(A) (also stating that the charter "shall operate as a repeal or suspension of the law to the extent of conflict, and the law shall not thereafter be operative as to such conflict"). "The charter," however, "shall be consistent with and subject to the state constitution, and not in conflict with . . . general laws of the state not relating to cities." A.R.S. § 9-284(B); *see City of Tucson v. Ariz. Alpha of Sigma Alpha Epsilon* (*Arizona ASAE*), 67 Ariz. 330, 335 (1948) (noting that § 9-284's predecessor statute "supplements" article 13, section 2 of the Arizona Constitution).

¶40        "The purpose of the home rule charter provision of the Constitution was to render the cities adopting such charter provisions as nearly independent of state legislation as was possible." *City of Tucson v. Walker*, 60 Ariz. 232, 239 (1943) (internal quotation mark omitted) (quoting *Axberg v. City of Lincoln*, 2 N.W.2d 613, 614 (Neb. 1942)). Consistent with that purpose, we have articulated the following rule:

> Where the legislature has enacted a law affecting municipal affairs, but which is also of state concern, the law takes precedence over any municipal action taken under the home rule charter. But where the legislative act deals with a strictly local municipal concern, it can have no application to a city which has adopted a home rule charter. Whether or not an act of the legislature pertains to a matter of local or state-wide concern becomes a question for the courts when a conflict of authority rises.

*Id.*; *see also Tucson II*, 229 Ariz. at 174 ¶ 10 ("[A] home rule city deriving its powers from the Constitution is independent of the state Legislature as to all subjects of strictly local municipal concern.") (internal quotation marks omitted) (quoting *City of Tucson v. Tucson Sunshine Climate Club*, 64 Ariz. 1, 8–9 (1945)); *Luhrs v. City of Phoenix*, 52 Ariz. 438, 442–43 (1938); *Clayton*, 38 Ariz. at 144–45; *id.* at 468 (on denial of motion for rehearing in *Clayton*).

¶41        Tucson has been a charter city pursuant to article 13, section 2 since 1929. *See Tucson II*, 229 Ariz. at 173 ¶ 1. Its charter broadly states that

the City has the "power . . . [t]o purchase, receive, have, take, hold, lease, use and enjoy property of every kind and description, both within and without the limits of said city, and control and dispose of the same for the common benefit." Tucson City Charter, ch. 4, § 1(4). Based on that authority, in 2005 the City passed the Ordinance in which Tucson Code § 2-142 was enacted.

¶42        Under this state's well-established jurisprudence, whether the City's Code controls over the conflicting state laws essentially hinges "on whether the subject matter is characterized as of statewide or purely local interest." *Tucson II*, 229 Ariz. at 176 ¶ 20 (citing *Strode v. Sullivan*, 72 Ariz. 360, 365 (1951)). We acknowledge that the extensive Arizona case law in this area is muddled. As we noted in *Tucson II*, "[m]any municipal issues will be of both local and state concern," and thus differentiation is "problematic in application" because it "often involves case-specific line drawing," and "[t]he concepts of 'local' versus 'statewide' interest do not have self-evident definitions." 229 Ariz. at 176 ¶ 20; *see also Luhrs*, 52 Ariz. at 442–43 (to same effect); John D. Leshy, The Arizona State Constitution 334 (2d ed. 2013) (observing that "the numerous court decisions addressing issues of charter city power show considerable variation in the flexibility with which they construe charters"); *cf. Strode*, 72 Ariz. at 366 (noting the "difference of opinion" in case law "as to what activities of a charter city are of local interest or concern and therefore free from legislative interference").

¶43        Our concurring colleague, Justice Bolick, faults *Strode* as setting Arizona courts on a wayward path that is untethered to article 13, section 2, asserts that *Strode* and similar cases should be overruled, and disavows as irrelevant in cases like this any distinction between matters of statewide interest and those of purely local concern. *Infra* ¶¶ 76–78, 80 (Bolick, J., concurring in part and in the result). Notably, well before *Strode*, this Court in several cases (including *Clayton*, which Justice Bolick applauds, *infra* ¶ 73–74) recognized as significant the distinction that he deems immaterial. *See, e.g.*, *Clayton*, 38 Ariz. at 468 (on motion for rehearing) (stating that where "the subject is of state-wide concern, and the legislature has appropriated the field and declared the rule, its declaration is binding throughout the state" and controls over conflicting local laws); *Luhrs*, 52 Ariz. at 442 (same, and recognizing this as "the general rule"); *Walker*, 60 Ariz. at 239 (quoting *Axberg*, 2 N.W.2d at 614) (noting that if a state statute addresses a matter of purely local concern it does not apply to a charter city's law on that subject).

¶44        The unarticulated but obvious take away from Justice Bolick's concurrence is this: assuming it is constitutional, a state statute on any particular topic will always trump and invalidate a political subdivision's conflicting ordinance, even if the topic indisputably is solely and purely one of local concern. Under that view, one must wonder what is left of charter cities' authority under article 13, section 2.

¶45        While thought-provoking, Justice Bolick's concurrence is puzzling not because of its content but rather because of its gratuitous nature. No party or amicus has briefed or argued that *Strode* was wrongly decided, that its analysis conflicts with the constitution, or that it or any other case should be overruled. We generally do not reach out to decide important constitutional issues or to upset established precedent when no party has raised or argued such issues. *See, e.g., State v. Valenzuela*, 239 Ariz. 299, 306 ¶ 21 (2016) (declining to address issues "[t]he parties did not brief"); *State v. Martinez*, 230 Ariz. 208, 212 ¶ 10 n.2 (2012) (refusing to address Arizona constitutional issues "not separately argued"). *But cf. Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 319–21 & 320 n.6, 349–50 (1971) (overruling a prior case when the federal government, appearing as amicus curiae, urged that result and the parties addressed the issue at oral argument). Exercising judicial restraint, we therefore decline to sua sponte address further the points that only Justice Bolick makes.

¶46        In the end, we find no need here to overhaul our longstanding analytical approach to resolving conflicts between state and local laws. This case does not fall within the "doubtful or twilight zone separating those matters that are clearly of municipal concern from those that are not." *Clayton*, 38 Ariz. at 148; *see also Ariz. ASAE*, 67 Ariz. at 336 (also referring to "a twilight zone" in which it is difficult to clearly discern whether legislation is of general or rather merely local concern). The State identifies several matters of alleged statewide concern implicated by its statutes and on which Tucson Code § 2-142 encroaches: regulating firearms under the state's police powers; regulating police departments (and other government agencies) handling forfeited or unclaimed property; protecting the constitutional right to bear arms; and regulating city budgets and finances. To varying degrees, we are persuaded that at least some of those asserted state interests exist and prevail over the Ordinance.

¶47        Unlike municipalities, which have "no inherent police power," the state has broad police power, including "[t]he protection of life, liberty, and property, and the preservation of the public peace and order,

in every part, division, and subdivision of the state." *Luhrs*, 52 Ariz. at 444 (internal quotation marks omitted) (quoting *Kansas City v. J.I. Case Threshing Mach. Co.*, 87 S.W.2d 195, 202 (Mo. 1935)); *see also State v. Jaastad*, 43 Ariz. 458, 463 (1934) ("The police power inheres in the state and not in its municipalities." (quoting *Clayton*, 38 Ariz. at 145)). Matters involving the police power generally are of statewide concern. *See Associated Dairy Prods. v. Page*, 68 Ariz. 393, 396–97, 400–01 (1949) (noting "concern of the state in the exercise of its police powers" and holding that regulation of milk products was within scope of statewide concern for public health); *see also City of Scottsdale v. State*, 237 Ariz. 467, 471 ¶17 (App. 2015) ("Arizona courts have rejected municipal ordinances that conflict with state statutes . . ., particularly when such ordinances involve the police powers of the state.").

¶48 The laws at issue here implicate the state's police power in several respects: the disposition of forfeited or unclaimed property, the conduct of law enforcement officers, including their handling of unclaimed property, and the regulation of firearms.

¶49 The Tucson Police Department's disposition of property (whether forfeited or unclaimed) is an exercise of police power granted by the state. *See* A.R.S. §§ 12-940 to -945 (relating to disposition of unclaimed property); A.R.S. §§ 13-4301 to -4315 (forfeiture); *see also Van Oster v. Kansas*, 272 U.S. 465, 467 (1926) ("[A] state in the exercise of its police power may forfeit property . . . ."). Thus, the state's authority validly extends over the possession and disposition of the firearms. *See McMann v. City of Tucson*, 202 Ariz. 468, 472 ¶ 9 (App. 2002) ("In general, when a city acts 'as an agent of the state,' the subject upon which it acts is not of solely local concern." (quoting *Luhrs*, 52 Ariz. at 443)).

¶50 Relatedly, regulating police departments' conduct, including their handling of unclaimed property, is also a matter of statewide concern. *See* A.R.S. §§ 12-940 to -945. Arizona case law recognizes the statewide interest in subjects even tangentially connected to the work of public safety officers and criminal justice. *See Jett v. City of Tucson*, 180 Ariz. 115, 121 (1994) (removal of city magistrates from office); *Walker*, 60 Ariz. at 237 (police pensions); *Luhrs*, 52 Ariz. at 448 (police and firefighter minimum wage); *Prendergast v. City of Tempe*, 143 Ariz. 14, 17–18 (App. 1984) (pay for police officers' lunch hour). "[A] policeman . . . in the regular line of duty is performing a governmental function . . . ." *Luhrs*, 52 Ariz. at 446; *see also id.* at 444 ("Certain functions have . . . definitely been determined governmental, the control of which remains in the state."). And the

Ordinance relates to the day-to-day work of police as much as the matters addressed in the above-cited cases.

**¶51**          Regulation of firearms, including their preservation or destruction, also involves the state's police power and is of statewide concern. *See Dano v. Collins*, 166 Ariz. 322, 324 (App. 1990) (compiling cases from other jurisdictions where firearm regulations were upheld as valid exercises of police power); *State v. Beadle*, 84 Ariz. 217, 221–22 (1958) ("The purpose of an Act, promulgated under the State's police power, is to protect the public health, safety or welfare."). The legislature has indicated that the disposal of firearms by government agencies is itself a component of firearm regulation by specifically including the disposal restrictions within a comprehensive statutory firearms regulation scheme. *See* A.R.S. § 13-3108; *cf. Tucson Sunshine Climate Club*, 64 Ariz. at 8 (requiring municipalities to participate in a general advertising plan would show the matter is of statewide concern). Because both Tucson Code § 2-142 and the state laws with which it conflicts involve the state's police power and matters "that the entire state is interested in," the matters at issue here "are proper subjects for general laws." *Luhrs*, 52 Ariz. at 448 (holding that "the matter of pensioning policemen, as also the matter of fixing a minimum wage for policemen and firemen, is of state-wide concern"). Accordingly, although the state laws in question undoubtedly "affect[] municipal affairs," they are also of "state concern" and therefore "take[] precedence" over the City's conflicting Ordinance. *Walker*, 60 Ariz. at 239.

**¶52**          The City points to the lack of any evidence "of a gun shortage in Tucson, leaving Tucsonans or visitors without access to firearms in the City," or any evidence "that the ordinance impacts anyone or anything outside of Tucson." But as the State observes, "[t]he number of firearms affected by [Code § 2-142] has nothing to do with the nature of the regulated subject matter. As this Court has explained, 'whether general state laws displace charter provisions depends on whether the *subject matter* is characterized as of statewide or purely local interest.'" (citing *Tucson II*, 229 Ariz. at 176 ¶ 20).

**¶53**          The State and amicus National Rifle Association argue that preserving the right to bear arms under the federal and state constitutions is also a subject of state concern. *See* U.S. Const. amend. II; Ariz. Const. art. 2, § 26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (describing the right to bear arms as "fundamental to *our* scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition" (internal

quotation marks omitted) (first citing *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); and then quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (noting that the people "elevate[d] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). We agree with that proposition, but even assuming that the Ordinance somehow implicates that right, we need not address this argument inasmuch as the superiority of state law over the Ordinance is clearly established based on the state's asserted police powers discussed above.

¶54 The confluence of the state's broad police powers, Arizona's comprehensive statutory and regulatory schemes regarding firearms and unclaimed or forfeited property, and the state's interests in regulating law enforcement agencies' handling of such property, all lead to one conclusion: the pertinent state statutes, §§ 12-943, -945(B), and 13-3108(F), embrace a topic of statewide interest and concern and, conversely, the Ordinance does not address a matter of purely local concern. Therefore, the Ordinance cannot legally coexist with the applicable and controlling state law.

¶55 The City's contrary arguments are not persuasive. Relying on article 13, section 2 of the Arizona Constitution and a handful of Arizona cases, the City contends that it "has charter authority to dispose of property it owns," including firearms. Because the state statutes address matters of statewide interest, however, whatever powers the City seeks to exercise under its home-rule charter authority and related ordinances must be "consistent with, and subject to, the Constitution and laws of the state." Ariz. Const., art. 13, § 2; *accord* A.R.S. § 9-284(B). Our cases have consistently recognized this significant constitutional restraint on charter cities' powers. *See, e.g.*, *Tucson II*, 229 Ariz. at 174 ¶ 9; *Strode*, 72 Ariz. at 364 (observing that a charter city does not have "carte blanche authority or plenary power to adopt any legislation that it might desire"); *Tucson Sunshine Climate Club*, 64 Ariz. at 4, 6 (a charter city's powers extend "not only in matters of local concern, but also in matters of state-wide concern, within its territorial limits, unless the Legislature has appropriated the field, and directly or by necessary implication established a rule, beyond which the city may not go"); *Luhrs*, 52 Ariz. at 442 (recognizing the "general rule" that when "the subject is of statewide concern, and the Legislature has appropriated the field and declared the rule, its declaration is binding throughout the state" (quoting *Clayton*, 38 Ariz. at 468)).

¶56 This Court has narrowly limited the concept of "purely

municipal affairs," or "local interest or concern," *see Strode*, 72 Ariz. at 365-66, restricting the extent to which charter city ordinances can prevail over state law. In only two areas have we upheld a municipal ordinance that directly conflicts with state law. First, we have held that the "method and manner of conducting elections in the city . . . is peculiarly the subject of local interest and is not a matter of statewide concern." *Strode*, 72 Ariz. at 368; *see also Tucson II*, 229 Ariz. at 177 ¶¶ 30–31 (concluding that "Tucson's manner of electing its city council members supersedes the conflicting provisions of [state law]," and observing that "[i]f the 'home rule' provisions of Article 13, Section 2 are to have effect, they must at the least afford charter cities autonomy in choosing how to elect their governing officers"). These cases are inapposite and unhelpful to the City, inasmuch as the conflict here does not involve municipal elections or "the authority of charter cities to structure how their governing officers are elected." *City of Tucson v. State* (*Tucson III*), 235 Ariz. 434, 435 ¶ 2 (App. 2014).

¶57 Second, this Court has held that "the manner and method of disposal of real estate of a city is not a matter of state-wide public concern." *Arizona ASAE*, 67 Ariz. at 336; *see also McMann*, 202 Ariz. at 470 ¶ 1, 472 ¶¶ 10–11, 474 ¶ 18 (upholding city ordinance requiring lessees of city-owned real property to perform "instant background checks for prospective gun purchasers during gun shows held at the [City's convention center]" because "the use permit" is "essentially a lease" and thus "a disposition of property," a city was "engaging in business activities," and "the legislature did not clearly intend to preempt the City from requiring [such] background checks"). These cases likewise do not support the City's position here.

¶58 Unlike this case, neither *Arizona ASAE* nor *McMann* involved a clear conflict between a municipal law or action and a state law of general application and concern. In *Arizona ASAE*, for example, this Court determined that the state law at issue clearly "ha[d] no application to charter cities" and observed that other Arizona cities and towns have "no interest" in what Tucson's charter provides regarding "the manner and method of disposal of [a city's] real estate." 67 Ariz. at 335, 336. And in *McMann*, the state had not attempted to regulate (as an exercise of its police power) the leasing of city property. *See McMann*, 202 Ariz. at 473 ¶ 14 (noting that "the context of [the subject statute] in the entire [state] legislative scheme does not establish a clear legislative intent to preempt

the City's ordinance"); *cf. City of Scottsdal*e, 237 Ariz. at 471 ¶ 16, 472 ¶ 23 (distinguishing *Arizona ASAE* and *McMann* because "selling and leasing property owned by a municipality do not implicate the police powers of the state," and holding that a state statute "preempts local ordinances that impose a blanket prohibition on sign walkers conducting business on public sidewalks"). Because the statutes here involve matters of "state-wide concern" and "the legislature has appropriated the field" regarding governmental entities' destruction or disposal of firearms, "its declarations are binding throughout the state, and all cities and municipalities, including charter cities, are precluded" from directly contravening the statutes through local laws. *Arizona ASAE*, 67 Ariz. at 336.

¶59 Other arguments presented by the City and amicus the League of Arizona Cities and Towns are also unpersuasive. Relying on *Luhrs*, the League asserts that "whether the property at issue is real or personal, guns or butter, if it is owned by a charter city, its use or disposition is a matter in which the Legislature is constitutionally proscribed from interfering." *See Luhrs*, 52 Ariz. at 442–43 (noting that when the particular activity "is exercised by the city in its proprietary capacity, it is a power incident to home rule"); *see also Tucson Sunshine Climate Club*, 64 Ariz. at 8 (observing that in advertising its advantages, city was "acting in its proprietary rather than its governmental capacity" and "not acting as the agent of the state"); *cf.* Ariz. Const. art. 13, § 5 ("Every municipal corporation within this State shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said municipal corporation.").

¶60 This argument, however, skirts the pivotal inquiry in cases like this: "whether the subject matter is characterized as of statewide or purely local interest." *Tucson II*, 229 Ariz. at 176 ¶ 20. Thus, even if relevant, the City's ownership interest or proprietary capacity is not determinative. In addition, the City does not destroy firearms in a proprietary capacity (and the City does not specifically argue otherwise). *Cf. City of Scottsdale v. Mun. Court*, 90 Ariz. 393, 398–99 (1962) (a city's operation of a sewage plant is a governmental function); *Jones v. City of Phoenix*, 29 Ariz. 181, 181-82 (1925) (a city's disposal of garbage is a governmental function). Just as a city's wastewater management and disposal are governmental functions, so too is the City's destruction of firearms.

¶61 Notably, over the past seventy years only a few of the many Arizona cases addressing city/state conflicts under article 13, section 2 have

cited, let alone based the decision on, a proprietary/governmental distinction that originated from dicta in *Luhrs*, 52 Ariz. at 443 (stating that if a municipality's activity "is carried on . . . as an agent of the state[,] . . . it is of general or public concern," but "[i]f it is exercised by the city in its proprietary capacity, it is a power incidental to home rule"). *See Tucson Sunshine Climate Club*, 64 Ariz. at 8 (same); *McMann*, 202 Ariz. at 472 ¶ 11 (noting that Tucson's "[o]peration of a convention center is a constitutionally permitted business activity"); *Shaffer v. Allt*, 25 Ariz. App. 565, 569–70 (1976) (referring to a city's "proprietary powers" and holding that local ordinance allowing city to purchase liquor license and sell alcoholic beverages at city recreation facility was not inconsistent with the Arizona Constitution or "any general law of the state"). Because the proprietary/governmental distinction is murky and unhelpful in resolving disputes of this kind, we do not view it as an appropriate factor in determining whether a state law relates to a matter of "statewide or purely local interest." *Tucson II*, 229 Ariz. at 176 ¶ 20; *cf. Ryan v. State*, 134 Ariz. 308, 310 (1982) (abolishing as an unnecessary, "speculative exercise" the "public/private duty doctrine" in determining governmental immunity issues).

¶62        The City also proposes a balancing test, under which courts would balance the competing state and municipal interests to determine if the asserted statewide interest is "sufficiently concrete and identifiable to outweigh the local interest of home rule cities in municipal self-government." In support of that concept, the City cites *Johnson v. Bradley*, in which the California Supreme Court stated that "*as a condition of state legislative supremacy*," the state must show "*a dimension demonstrably transcending identifiable municipal interests*," so that the phrase "statewide interest" does not invade areas of intramural concern only, thereby preserving core values of charter city government. 841 P.2d 990, 996 (Cal. 1992). Under California law, if a statewide concern is established, a charter city's contrary law is preempted only if the state law is "reasonably related" to resolving the state's interest and "narrowly tailored" to limit incursion into legitimate municipal interests. *Id.* at 999–1000 (citation and internal quotation marks omitted). *Johnson* was based on California's constitution, which exempts from the control of state law "all ordinances and regulations in respect to municipal affairs." Cal. Const. art. XI, § 5(a). Arizona has no counterpart, but instead requires a city charter to be consistent with "the laws of the state." Ariz. Const. art. 13, § 2.

**¶63** We reject the California approach and the City's proposed balancing test. It would not aid courts in determining if a particular subject is of statewide interest or rather purely local concern. We therefore decline to follow *Johnson* and cases from other states that embrace a balancing approach. *See U.S. Elevator Corp. v. City of Tulsa*, 610 P.2d 791 (Okla. 1980); *Madison Teachers, Inc. v. Walker*, 851 N.W.2d 337 (Wis. 2014).

**¶64** In addition, a balancing test finds only limited, marginal support in Arizona. In *Tucson I*, without citing any Arizona authority, the court of appeals found "a balancing test" appropriate in determining whether local or statewide interests were "paramount." 191 Ariz. at 439. More recently, however, the court of appeals correctly found that a trial court erred in applying a balancing test to resolve a city/state dispute, aptly noting that this Court has never used or approved such a test in this context. *Tucson III*, 235 Ariz. at 439 ¶ 16 n.6 (App. 2014). We agree and therefore disapprove *Tucson I*'s use of a balancing test in its analysis. In short, we find such a test is neither helpful nor appropriate, and instead would potentially cause confusion and inconsistent results, in resolving issues under article 13, section 2.

## V. Conclusion

**¶65** The state laws here, A.R.S. §§ 12-945(B) and 13-3108(F), involve matters of statewide, not purely local, interest and thus displace the City's inconsistent Ordinance, Tucson Code § 2-142, regarding destruction of firearms. Having decided the legal issue presented under A.R.S. § 41-194.01(B)(2), we do not address other issues pertaining to S.B. 1487. The State is awarded its reasonable attorney fees under A.R.S. § 12-348.01, upon its compliance with ARCAP 21.

JUSTICE BOLICK, concurring in part and in the result:

**¶66** The Court does a fine job harmonizing and applying what it aptly refers to as the "muddled" jurisprudence governing conflicts between city charters and state law and it reaches the correct result. Although I join fully in Parts I, II, and V of the Court's opinion, I write separately to address erroneous prior decisions that produced the jurisprudential muddle, from which we can extricate ourselves by aligning our case law with constitutional text.

**¶67** The Court describes this as a "gratuitous" endeavor. Respectfully, it is not. Although the parties may determine what issues are placed before us, they cannot constrain our analysis when a law's constitutionality is questioned. In every instance, that analysis should begin with the Constitution's text. Such analysis consists not merely of recitation but application. "We look first to the language of the provision, for if the constitutional language is clear, judicial construction is neither required nor proper." *Perini Land & Dev. Co. v. Pima Cty.*, 170 Ariz. 380, 383 (1992); *Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994) ("If the language is clear and unambiguous, we generally must follow the text of the provision as written."). Resort to the Constitution's plain meaning is especially essential where, as the Court freely acknowledges, the state of the law is disarray. *See, e.g.*, ¶ 46 (noting that the Court has at least twice described our jurisprudence as creating a "twilight zone"). In such instances, our fidelity should be to the Constitution rather than to the disarray. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 805-06 (2010) (Thomas, J., concurring in part and concurring in the judgment) (agreeing that the Second Amendment is applicable to the states, but urging the Court to abandon a "well-settled" but misguided test in favor of "a more straightforward path to this conclusion, one that is more faithful to the Fourteenth Amendment's text and history").

**¶68** Article 13, section 2, of the Arizona Constitution possesses the virtue of great clarity. It provides cities that meet certain criteria with a mechanism to secure greater self-governance. That section includes two provisions that squarely address the issue presented here. An eligible city "may frame a charter for its own government *consistent with, and subject to, the Constitution and the laws of the state*." Ariz. Const. art. 13, § 2 (emphasis added). Upon approval, the "charter shall become the organic law of such city and *supersede any charter then existing . . . and all ordinances inconsistent with said new charter*." *Id.* (emphasis added).

¶69          That clear language renders simple the dispute here.  As the Court amply demonstrates, Tucson's charter provision conflicts with state law regarding the disposition of seized firearms.  Tucson's charter is subject to that law and does not supersede it.

¶70          Were we construing and applying only the constitutional text as written, we would have no jurisprudential muddle.  Charter cities and the state would understand their respective boundaries and taxpayers could save the cost of unnecessary litigation.  But the tendency of the law toward complexity over clarity often seems irresistible.

¶71          As the Court observes, the law governing conflicts between state and charter cities did not end with the Constitution.  Shortly after the Constitution's ratification, the legislature passed an emergency statute presently codified as A.R.S. § 9-284 (the "charter statute").  Section 9-284(A) provides that where charter provisions "are in conflict with any law" relating to cities eligible for charter status "in force at the time of the adoption and approval of the charter, the provisions of the charter shall prevail notwithstanding the conflict."   Section 9-284(B) provides, "The charter shall be consistent with and subject to the state constitution, and not in conflict with the constitution and . . . general laws of the state not relating to cities."

¶72          Two observations about the charter statute are pertinent.  First, it established that charter provisions would prevail only as to conflicting statutes "relating to" charter-eligible cities "in force at the time of the adoption and approval of the charter."  Thus, the charter statute does not apply here because Tucson's charter was adopted long before the conflicting statute.   Second, if article 13, section 2, of the Arizona Constitution itself established supremacy of charters over certain conflicting state statutes, there would have been no need to enact that status through legislation, much less on an emergency basis.   The statute's enactment thus implied the legislature's recognition that article 13, section 2 did not, by its own terms, elevate charters over statutes.

¶73          Early cases harmonized the charter statute with the Constitution.  In *Clayton v. State*, 38 Ariz. 135 (1931), the Court invalidated local highway laws that conflicted with state statutes. The Court posed the question of who determines whether a matter is of "general statewide concern or of purely municipal concern?  Shall the city be permitted to determine this question, or shall the state?"  *Id.* at 145.  Applying the

Constitution, the Court's answer was unequivocal: the state. *Id.* (quoting *State v. Thompson*, 137 N.W. 20, 31 (Wis. 1912)) (even where the Constitution divides powers between the state and cities, the state alone determines what is a municipal concern). Quoting the Oklahoma Supreme Court, the Court observed that the Constitution "in no way limited or abridged the supreme sovereign control over such municipality, but only guarantees to such municipality the right of municipal government subject to the Constitution and laws of the state." *Id.* at 143 (quoting *City of Sapulpa v. Land*, 223 P. 640, 646 (Okla. 1924)). If charter powers were not "subject to the supreme powers of the Legislature[,] . . . then we have the inevitable result that the framers of the Constitution authorized the establishment of independent petty states within this state." *Id.* (quoting *City of Sapulpa*, 223 P. at 646).

¶74        The *Clayton* Court continued its analysis, however, by noting that article 13, section 2 was supplemented by statute. *Id.* at 146. The Court explained that *under the statute*, where a conflict exists between preexisting state laws and charter provisions, the latter shall prevail except as to general laws of the state not relating to cities. *Id.* The Court went on to conclude that the law at issue was a general law not relating to cities, thus it prevailed over the conflicting charter provision. *Id.* at 146-49. The Court made clear that it was the statute (which is not at issue here), not the Constitution, that allowed charter provisions to prevail over conflicting state laws in limited circumstances. *Id.*; *see also* ¶ 39 (acknowledging that the statute, not the Constitution, established charter cities' primacy over state laws in certain circumstances).

¶75        In *Mayor & Common Council of City of Prescott v. Randall*, 67 Ariz. 369 (1948), the Court struck down a charter city's alcohol regulations that conflicted with state law. The Court cited numerous cases to the effect that "a charter city is sovereign in all of its 'municipal affairs' where the power attempted to be exercised has been specifically or by implication granted in its charter." *Id.* at 371. However, the Court noted that in "practically all of the foregoing cases the effect of section 16-303 [predecessor to § 9-284] . . . has been directly or indirectly considered by this court" as supplementing charter powers conferred by the Constitution. *Id.*; *see also City of Tucson v. Ariz. Alpha of Sigma Alpha Epsilon* (*AASAE*), 67 Ariz. 330, 335 (1948) (resolving conflict between state and charter city laws pursuant to charter statute).

¶76        But only three years later, those statutory considerations

vanished from the Court's analysis and the charter statute was grafted onto article 13, section 2. In *Strode v. Sullivan*, 72 Ariz. 360 (1951), the Court held that a charter city's election laws superseded conflicting state law. The Court selectively quoted article 13, section 2, placing emphasis on a city forming a charter "*for its own government*" and omitting any reference to charters superseding inconsistent local laws but not state laws. *Id.* at 364.

¶77        Without any overt indication that it was doing so, the Court substituted the charter statute language for the constitutional text. The difference between the constitutional rule announced in *Strode* and the actual constitutional text is so stark that it invites direct comparison:

> Article 13, section 2:
>
> Eligible city "may frame a charter for its own government consistent with, and *subject to*, the Constitution and *the laws of the state* . . . . [S]aid charter shall become the organic law of such city and *supersede any charter then existing . . . and all ordinances inconsistent with said new charter*.

Ariz. Const. art. 13, § 2 (emphasis added).

> *Strode* Rule:
>
> [A] city charter . . . becomes the organic law of the city and the *provisions of the charter supersede all laws of the state in conflict with such charter provisions* insofar as such laws relate to purely municipal affairs.

72 Ariz. at 365 (emphasis added).

¶78        The Court in *Strode* literally rewrote the constitutional provision at issue, which of course it had no power to do. It thus replaced the Constitution's bright line with a judicially manufactured line of constitutional demarcation between matters of statewide concern, over which the state prevails, and matters of purely local concern, over which charter cities have hegemony. That blurry line is entirely the cause of our muddled jurisprudence over the past two-thirds of a century.

¶79        So the question presents itself: should we hew to the

Constitution or to our prior decisions? The judicially created doctrine of *stare decisis* instructs that the rule of law requires stability and continuity, and therefore we should generally follow precedent. *Galloway v. Vanderpool*, 205 Ariz. 252, 256 ¶ 16 (2003). But as judges, we take an oath to the Constitution, not to the *stare decisis* doctrine. Thus, "[w]hile, under our judicial system, all courts have a strong respect for precedent, this respect is a reasonable one which balks at the perpetuation of error, and the doctrine of stare decisis should not prevail when a departure therefrom is necessary to avoid the perpetuation of pernicious error." *State ex rel. La Prade v. Cox*, 43 Ariz. 174, 183 (1934). "*Stare decisis* is 'at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions.'" *Mitchell v. United States*, 526 U.S. 314, 343 (1999) (Thomas, J., dissenting) (quoting *Agostini v. Felton*, 521 U.S. 203, 235 (1997)); *see also Galloway*, 205 Ariz. at 256 ¶ 16 (*stare decisis* "is strongest when prior decisions construe a statute"). "The Court has therefore adhered to the rule that *stare decisis* is not rigidly applied in cases involving constitutional issues, and has not hesitated to overrule decisions, or even whole lines of cases, where experience, scholarship, and reflection demonstrated that their fundamental premises were not to be found in the Constitution." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 787 (1986) (White, J., dissenting) (internal citation omitted), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); *see also id.* at 787–88.

**¶80**     Given that *Strode* departed so sharply from constitutional text and has spawned constant litigation to ascertain its contours, I would overturn it along with other decisions holding that charter enactments superseded conflicting state laws. *See, e.g.*, *City of Tucson v. State*, 229 Ariz. 172 (2012); *City of Tucson v. State*, 235 Ariz. 434 (App. 2014); *McMann v. City of Tucson*, 202 Ariz. 468 (App. 2002). Instead, I would adhere to the Constitution's rule that city charters do not supersede conflicting state laws.[3]

---

[3]  Applying the constitutional rule would preserve judicial analysis of whether the state's statute occupies the field of regulation and conflicts with the charter city provision. If it does not, the city's provision should stand. *See, e.g.*, *Babe's Cabaret v. City of Scottsdale*, 197 Ariz. 98, 103–04 ¶¶ 18–19

**¶81** The City protests that such a construction would render charters meaningless. Not at all. As the Court observed in *AASAE*, "Cities and towns, regardless of how organized, have only such powers as are expressly or by implication conferred upon them." 67 Ariz. at 334–35. "A municipality has no inherent powers, but only such powers as are expressly conferred by statute or are implied as necessary in aid of those powers which are expressly conferred." 1 McQuillan Mun. Corp. § 2:10 (3d ed.). By contrast, "[a] presumption exists that the exercise of power by a home rule municipal corporation is valid if no restriction is found in the constitution, the charter itself, or the acts of the general assembly." 2A McQuillan Mun. Corp. § 10:16 (3d ed.). In other words, a non-charter municipality generally may do only what the state expressly authorizes; a charter city generally may do anything that the state does not expressly forbid. That is a significant difference in authority. At the same time, it is unsurprising that a subdivision of the state would not have the power to override the powers of the state itself.

**¶82** The Court today performs a salutary service by clarifying the law as much as the *Strode* construct permits. The Court reaffirms, for instance, that the state retains all police powers to the exclusion of charter cities. Likewise, it usefully disavows the distinction between governmental and proprietary functions, whose foundation is completely lacking in the relevant constitutional text.

**¶83** The Court also observes that the subject matter at issue here is addressed by our state's constitutional protection of the right to keep and bear arms in article 2, section 26 of the Arizona Constitution. In my view, that necessarily elevates the subject matter to statewide concern. Tucson contends that its regulation does not limit the constitutional right to "bear arms." Ariz. Const. art. 2, § 26. The inquiry under current precedents is not whether the charter enactment implicates a constitutional right, but whether it implicates a matter of statewide concern. The state may reasonably determine that destroying firearms limits the quantity of firearms in the market, so that its statute addresses a matter of statewide concern not only pursuant to the state's police powers but its power to enforce the right to bear arms. *Cf. City of Scottsdale v. State*, 237 Ariz. 467, 472 ¶¶ 20–21 (App. 2015) (state is authorized to protect free speech rights,

---

(App. 1999); *City of Tucson v. Rineer*, 193 Ariz. 160, 163 ¶¶ 7–9, 164 ¶ 11 (App. 1998).

which prevails over conflicting charter enactment).

¶84        Although the Court draws the correct lines here, the Constitution makes that exercise unnecessary and improper. I look forward to the day when we no longer have to draw lines between such conflicting enactments, because we finally accept that our Constitution has drawn that line for us.

STATE v. CITY OF TUCSON
JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ,
Concurring in Part and in the Result

JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ, concurring in part and in the result.

¶85      I concur in Parts I, II, IV, and V of the majority opinion.[4] I also agree with Part III to the extent the majority concludes we do not have to impose a bond pursuant to A.R.S. § 41-194.01(B)(2). However, I disagree with the majority's reasoning that imposing the bond "would displace this Court from its constitutionally assigned role under article 6." *Supra*, ¶ 33. Rather, I conclude the bond provision is unenforceable because it is incomplete and unintelligible.

¶86      I also disagree with the majority's suggestion that we should defer ruling on the bond provision until there is a case "where that issue is specifically raised." *Supra*, ¶ 35. The parties have had a full opportunity to address the enforceability of the bond provision; indeed, both parties have discussed the issue in their briefs. It is squarely before this Court and we must address it.

¶87      The bond provision contains two clear directives. First, section (B)(2) requires this Court to impose a bond when a special action is filed by the Attorney General. The statute states that the "court *shall* require the county, city or town to post a bond equal to the amount of state shared revenue [("SSR")] paid to the county, city or town pursuant to section 42-5029 and 43-206 in the preceding six months." (emphasis added.) By using the word "shall," the legislature clearly intended the bond provision to be mandatory. *See Ins. Co. of N. Am. v. Superior Court*, 166 Ariz. 82, 85 (1990) ("The use of the word 'shall' indicates a mandatory intent by the legislature.").

¶88      Second, compliance with the bond provision is not a prerequisite for judicial review. Section (B)(2) requires this Court to determine whether a local ordinance violates state law. The statute does not state, nor does it imply, that our ruling is contingent on a party posting the bond.

¶89      Despite these directives, the bond provision fails to provide any direction as to how — or why — this Court should impose the bond.

---

[4] My concurring colleague, Justice Bolick, does not join Part III of the Court's opinion. *See* ¶¶ 66-84, *supra.*

STATE v. CITY OF TUCSON
JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ,
Concurring in Part and in the Result

Of greatest concern is the fact that section (B)(2) does not prescribe what occurs if a party fails to post the bond. For example, the statute does not authorize this Court to enter a default in favor of the Attorney General, or to strike the City's response. In short, the text of the statute does not state, either expressly or impliedly, that failing to post a bond deprives the City of its right to defend the Ordinance before this Court.

¶90        The bond provision is incomplete in a number of other areas. Unlike most bond statutes, section (B)(2) contains no provision for reducing the amount of the bond on the basis of economic hardship. *Cf.* A.R.S. § 12-2108(C) (allowing for reduction of a supersedeas bond upon a showing that the appellant will suffer substantial economic harm). Additionally, section (B)(2) does not identify the conditions for forfeiting or exonerating the bond. *Contra*, *e.g.*, A.R.S. § 12-1537 (stating that a replevin bond posted by a defendant is exonerated if the attachment is vacated or a judgment is entered for the defendant); A.R.S. § 14-5419(I) (a conservator's bond is exonerated upon filing of a closing statement); A.R.S. § 13-3974 (stating the conditions for exonerating an appearance bond); A.R.S. § 13-3858 (providing for forfeiture of an appearance bond if a defendant fails to appear in court).

¶91        Section (B)(2) also does not state the bond's purpose. If its purpose is to ensure that a city or county complies with state law during the pendency of the Attorney General's special action, then this is a valid reason for imposing the bond. *See Porter v. Commercial Standard Ins. Co.*, 112 Ariz. 491, 492-93 (1975) (stating a supersedeas bond is intended to maintain "the status quo [of the parties] until the appellate process is completed"). But if this is the purpose of the statute, we are left with a puzzling result: under section (B)(1), when the Attorney General determines a local ordinance does violate state law, no bond is required during the thirty-day cure period. However, under section (B)(2), when no final determination has been made regarding a potential violation, a party is required to post a substantial bond while the Attorney General's special action is pending.

¶92        It is difficult to understand why section (B)(2) requires a bond, and section (B)(1) does not. In practice, section (B)(2) creates a greater financial burden when the Attorney General concludes an ordinance "may violate" state law than when the Attorney General concludes an ordinance "does violate" state law. Under section (B)(1), a city or county suffers no economic penalty until there has been a "final" determination that its

STATE v. CITY OF TUCSON
JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ,
Concurring in Part and in the Result

ordinance violates state law and it has been given thirty days to cure the violation. In contrast, under (B)(2), when the Attorney General determines there *may* be a violation of state law, the city or county is automatically required to post a bond equal to six months of its SSR.

¶93        The parties recognize that the bond provision, as written, is likely unenforceable. The City contends that imposing a bond consisting of six months' SSR creates an insurmountable financial burden. The City argues that imposing such a large bond would effectively prevent it from defending its Ordinance before this Court. Ariz. Const. art 2, § 13. In contrast, the State asserts that given the City's agreement to suspend enforcement of its Ordinance pending this litigation, the purpose of the bond is satisfied, and therefore imposing the bond is unnecessary. In the alternative, the State argues that even if the bond is unconstitutional, it is severable from section (B)(2).

¶94        In considering these arguments, the majority expresses concern that section (B)(2) places an undue financial burden on the City. Based on this concern, the majority generally agrees with the City that the bond provision may be unconstitutional. Specifically, the majority contends that imposing such a large bond "would likely dissuade" the City from defending its Ordinance, which in turn would "displace this Court from its constitutionally assigned role under article 6 of interpreting Arizona's constitution and laws." *Supra*, ¶ 33; Ariz. Const. art 6, § 1.

¶95        If the majority is indeed concerned that the bond provision may be unconstitutional on this basis, I disagree. Generally, we afford statutes a presumption of constitutionality. *Cf. Gallardo v. State*, 236 Ariz. 84, 87 ¶ 9 (2014) (discussing presumption of constitutionality generally afforded legislative enactments). Additionally, the record is undeveloped as to the actual bond amount the City will have to post. There has been no evidentiary hearing in this case. We have no testimony from witnesses, no exhibits or any other evidence showing the actual financial impact on the City. All we have are allegations by the City that it lacks the financial means to post the bond. And these allegations appear to be based on the assumption that section (B)(2) requires the City to post the full amount of the bond as a cash bond. However, section (B)(2), by its terms, does not prohibit the City from posting a security bond to satisfy the bond requirement. We have no evidence before us as to whether the City could post such a security bond.

STATE v. CITY OF TUCSON
JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ,
Concurring in Part and in the Result

¶96          The majority also concludes that based on the City's agreement to suspend enforcement of its Ordinance, imposing the bond is unnecessary in this case.  I recognize this is a practical approach to dealing with the deficiencies of the statute.  However, section (B)(2) does not, by its terms, authorize waiving the bond requirement based on such an agreement.  In the face of such a mandatory provision, we must either impose it, or explain why it is unenforceable.

¶97          At bottom, the problem with the bond provision is not ambiguous language or undefined terms.  Rather, it is, in several material respects, so incomplete as to be unintelligible.  The result is a partial, unfinished legislative directive that is impossible for this Court to enforce. *Cf. Cohen v. State*, 121 Ariz. 6, 9 (1978) (stating "it is the duty of a court in construing a statute to strive to uphold it whenever possible.").

¶98          Under these circumstances, I would declare the bond provision unintelligible and unenforceable, and provide the Legislature with an opportunity to fix it.  The unintelligibility doctrine is a well-established doctrine that has been applied in several states. *See Board of Trustees of Judicial Form Retirement System v. Attorney General of Com.*, 132 S.W. 3d 770, 779-81 (Ky. 2003); *Yeik v. Dept. of Revenue and Taxation*, 595 P.2d 965, 968-69 (Wyo. 1979); *State ex rel. Miller v. Brown*, 150 N.E.2d 46, 48 (Ohio 1958); *Davidson Bldg. Co. v. Mulock*, 235 N.W. 45, 54-56 (Iowa 1931); *Midwest Hotel Co. v. State Board of Equalization*, 273 P. 696, 697-99 (Wyo. 1929); *State ex rel. Hughes v. Reusswig*, 126 N.W. 279, 280 (Minn. 1910); *Ward v. Ward*, 37 Tex. 389, 392 (1872); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 134-138 (2012) (discussing the "Unintelligibility Canon" of statutory construction, which holds that an unintelligible, incomplete statute is unenforceable).

¶99          A careful reading of *Ethridge v. State Bd. of Nursing*, 165 Ariz. 97, 104 (App. 1989) and *State Compensation Fund v. De La Fuente*, 18 Ariz. App. 246, 251-52 (1972) also supports the existence of the unintelligibility doctrine in Arizona.  In *Ethridge*, the court stated that "[a]n indefinite and incomplete statute may be held invalid on *three* bases: (1) the language used may not have sufficient legal significance to be capable of intelligent execution; (2) the statute may unduly delegate legislative powers in violation of the separation of powers doctrine under article 3 of the United States Constitution, and (3) as applied, the statute may violate due process under the Arizona Constitution." (emphasis added) *Id.*, 165 Ariz. at 104.

STATE v. CITY OF TUCSON
JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ,
Concurring in Part and in the Result

Importantly, the first category mentioned — "the language used may not have sufficient legal significance to be capable of intelligent execution" — is identified as a separate, distinct basis from the other two grounds. Similarly, *De La Fuente* lists "*three* bases upon which a statute without the requisite definiteness and completeness may be held invalid," including "the language used may not have sufficient legal significance to be capable of intelligent execution." *Id.*, 18 Ariz. App. at 251-52 (emphasis added).

¶100     Generally, if a statute is ambiguous, courts apply a void-for-vagueness analysis. The unintelligibility doctrine, however, is distinct from this doctrine. *See*, *supra* ¶ 103. The void-for-vagueness doctrine is typically applied to ambiguous or indefinite statutes involving criminal or punitive civil laws, or laws involving First Amendment rights, that are applied to members of the general public. *See*, *e.g.*, *State v Holle*, 240 Ariz. 300, 310 ¶ 46 (2016) (holding that statutes defining crimes for sexual abuse and child molestation provided sufficient notice to the public of the proscribed conduct, and are not void for vagueness); *Western Waste Serv. Sys. v. Superior Court*, 120 Ariz. 90 (1978) (holding that Arizona Uniform Antitrust Act provision imposing treble damages for a "flagrant" violation of the statute was not void for vagueness). In contrast, the unintelligibility doctrine is reserved for incomplete, non-punitive civil statutes that are oftentimes directed at judicial procedures. *Board of Trustees*, 132 S.W. 3d at 778; *cf. De La Fuente*, 18 Ariz. App. at 251-52 (statute concerning authority of Industrial Commission to determine death benefits lacked any standards or regulations to govern Commission's decision; as a result, the statute was declared unenforceable on multiple grounds, including unintelligibility).

¶101     For example, in *Yeik* a statute provided that before a person could appeal a driver's license suspension to the district court, he was first required to file an appeal with the "revenue and tax commission." The statute, however, provided no regulations or directions as to how to pursue an appeal to the commission. In holding the statute was unenforceable as incomplete and unintelligible, the court stated:

> Those wishing to seek review from the tax commission are given no guidance by the rules and regulations as to: 1. Within what time frame must the appeal be effected? 2. What notice of appeal is required? 3. Is the decision of the hearing examiner stayed during the pendency of the review process or must the party seeking review specifically ask for such a

STATE v. CITY OF TUCSON
JUSTICE GOULD, joined by JUSTICE BOLICK and JUSTICE LOPEZ,
Concurring in Part and in the Result

stay? 4. Must the party seeking review write a brief? 5. Does the party seeking review have a right or obligation to present oral argument to the tax commission? There are a host of other unanswered procedural questions that the state tax commission must answer in the form of Reasonable rules and regulations before s 31-7-105(c) can have any real meaning.

*Yeik*, 595 P.2d at 968. *See also Ward*, 37 Tex. at 391-92 (statute was unenforceable because the procedures for filing an appeal from an interlocutory order were incomplete and unintelligible); *Midwest Hotel*, 273 P. at 697 (procedures for filing an appeal from the board of equalization were incomplete, and therefore unenforceable); *Davidson*, 235 N.W. at 54-56 (statute was unenforceable because procedures for appealing from a tax board of review decision were so indefinite and incomplete as to be unintelligible).

¶102       The unintelligibility doctrine is perhaps the quintessential example of how a court, acting with restraint, observes its constitutional role under the separation of powers. *See Board of Trustees*, 132 S.W. 3d at 781 (stating "the unintelligibility rule has its foundation in the constitutional requirement of separation of powers"); *see also* U.S. Const. art. I-III; Ariz. Const. art. 3. When faced with an incomplete, unintelligible statute, a court may either attempt to re-write the statute, or declare it unenforceable. *Id.* The first option is a clear violation of the separation of powers. Courts lack the constitutional authority to legislate, and this limitation is perhaps most acute when a court attempts to enforce a statute that, by virtue of its incompleteness, is really no law at all. *See Ballesteros v. Am. Standard Ins. Co. of Wis.*, 226 Ariz. 345, 349 ¶ 17 (2011) (stating "[i]f the legislature desires to add [ ] a requirement [to A.R.S. § 20–259.01], it may do so . . . but it is not our place to rewrite the statute"). In contrast, when a court declares an incomplete, unfinished statute unenforceable on the grounds of unintelligibility, it refrains from stepping outside its judicial authority, and provides the legislature with an opportunity to address the infirmities in the statute.

¶103       Thus, I conclude that because the bond provision is incomplete and unintelligible, it is unenforceable.